SCOTT R. JACOBSEN (118612015)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 519-0521
Facsimile:  (212) 223-6334
sjacobsen@scott-scott.com

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page.]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RICHARD TUNICK, on Behalf of Himself and Derivatively on Behalf of 3M COMPANY, | Civil Action No. _____ |
| Plaintiff, | |
| v. | |
| THOMAS K. BROWN, PAMELA CRAIG, DAVID B. DILLON, MICHAEL L. ESKEW, HERBERT L. HENKEL, AMY E. HOOD, MUHTAR KENT, DAMBISA F. MOYO, GREGORY R. PAGE, MICHAEL ROMAN, PATRICIA A. WOERTZ, INGE G. THULIN, NICHOLAS C. GANGESTAD, IPPO VROHIDIS, and TERI REINSETH, | |
| Defendants. | |
| v. | |
| 3M COMPANY, | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

## TABLE OF CONTENTS

I.      NATURE AND SUMMARY OF THE ACTION ............................................................... 1

II.     JURISDICTION AND VENUE ..................................................................................... 7

III.    PARTIES ......................................................................................................................... 8

    A.    Plaintiff ............................................................................................................... 8

    B.    Nominal Defendant ............................................................................................ 8

    C.    Director Defendants ........................................................................................... 8

    D.    Executive and Former Director Defendants ................................................... 11

IV.     SUBSTANTIVE ALLEGATIONS .............................................................................. 12

    A.    History of PFAS ................................................................................................. 12

    B.    The Company's Production and Sale of PFAS ................................................. 15

    C.    Decades-Long Internal Company Knowledge of the Deleterious Environmental Impacts of PFAS .......................................................................................................... 16

    D.    Decades-Long Internal Company Knowledge of Negative Health Impacts of PFAS ... 18

    E.    3M's Attempts to Downplay and Cover-Up Research into, and Actual, PFAS-Related Biological and Environmental Damage .......................................................... 21

    F.    3M Belatedly Reports Its Findings to the EPA and Ceases Production of PFOS and PFOA ................................................................................................................ 26

    G.    3M Continues to Produce PFAS, and Faces Ongoing Fallout for the Extensive, Long-Lasting, and Ongoing Damage PFAS Has Caused to the Environment and Living Things ............................................................................................................... 27

        1.    Increasing Regulation as a Result of Growing Public Knowledge Regarding the Hazardous Properties of PFAS ............................................................... 29

        2.    3M Faces Increasing Legal Liability as the Extent of the Harm from Decades of PFAS Contamination Is Uncovered ...................................................... 34

        3.    State Attorneys General File Suit Against 3M .................................... 38

        4.    Securities Fraud Class Action Claims .................................................. 44

        5.    3M Issues Further False and Misleading Statements as Lawsuits Representing Billions in Liability Mount into 2019 .................................................... 52

V.      MATERIALLY FALSE AND MISLEADING PROXY STATEMENTS ..................... 55

    A.    The 2017 Proxy Statement ................................................................................ 55

    B.    The 2018 Proxy Statement ................................................................................ 58

    C.    The 2019 Proxy Statement ................................................................................ 61

    D.    Proxy Statement Are False and Misleading .................................................... 64

VI.    CULPABLE BOARD KNOWLEDGE OF WRONGDOING ......................................... 64

    A.    Minnesota PFC Cases ................................................................................................. 68

        1.    State of Minnesota v. 3M Co. (Significant Development) .................................... 68

        2.    City of Lake Elmo v. 3M Co. ................................................................................ 69

    B.    Alabama PFC Cases .................................................................................................... 70

        1.    St. John, Chandler, and Stover Cases .................................................................. 70

        2.    *West Morgan-East Lawrence Water & Sewer Authority v. 3M Co. et al.* ............ 70

        3.    *Tennessee Riverkeeper, Inc. v. 3M Co., et al.* ....................................................... 71

        4.    *Billings, et al. v. West Morgan-East Lawrence Water and Sewer Authority, 3M, Dyneon, Daikin, BFI, and the City of Decatur* ..................................................... 71

        5.    *Gadsden Water v. 3M Co. et al.* .............................................................................. 72

        6.    *Owens et al. v. 3M Co. et al.* .................................................................................. 72

        7.    *Centre Water v. 3M Co., et al.* ............................................................................... 73

        8.    *King, et al v. 3M Co., et al.* (New Matter) ............................................................ 73

    C.    New York PFC Cases .................................................................................................. 73

        1.    Lucey, Wickenden, Andrick .................................................................................. 73

    D.    Michigan Class Action (New Matter) .......................................................................... 73

    E.    Aqueous Film Forming Foam (AFFF) Cases .............................................................. 74

    F.    Regulatory Proceedings ............................................................................................... 76

    G.    Conventional Remediation Sites .................................................................................. 78

VII.    DUTIES AND OBLIGATIONS OF THE INDIVIDUAL DEFENDANTS .................. 114

    A.    Duties of All Director Defendants ............................................................................... 114

    B.    Duties of Director Defendants on the Audit Committee ............................................. 117

VIII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS .................................... 121

IX.    DAMAGES TO THE COMPANY ................................................................................... 123

X.    CLAIMS FOR RELIEF .................................................................................................... 124

XI.    PRAYER FOR RELIEF ................................................................................................... 128

XII.    JURY DEMAND ............................................................................................................... 129

Plaintiff Richard Tunick ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, 3M Company ("3M" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its executive officers (collectively, the "Individual Defendants"), seeking to remedy the Individual Defendants' breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiff alleges the following based on personal knowledge for himself and his own acts, and information and belief for all other matters, based on, among other things, investigation conducted through his attorneys, which included the review and analysis of: (a) public filings made by 3M with the United States Securities and Exchange Commission ("SEC"); (b) press releases and other publications disseminated by 3M, related parties and other related non-parties; (c) press releases, public letters, internal 3M documents, and other publicly disseminated information released as a result of investigation by the Attorney General of the State of Minnesota into the wrongdoing described herein; (d) certain of 3M's internal Board minutes, Board-level materials, and other internal Company records obtained pursuant to a demand made pursuant to 8 *Del. C.* §220 to inspect certain Company books and records; (e) the proceedings of a related pending securities fraud class action filed against the Company, captioned *In re 3M Company Securities Litigation*, No. 2:19-cv-15982, in the United States District Court for the District of New Jersey (the "Securities Action"); and (f) other publicly available information concerning 3M and the Individual Defendants.

## I.      NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action filed on the behalf of 3M to redress wrongs committed by certain of the Company's officers and directors.

2.      3M has produced per- and polyfluoroalkyl substances ("PFAS"), a group of man-made chemicals, since the 1940s, which are included in many consumer products such as

firefighting foams, cookware, food packaging, waterproofing, and stain repellants. PFAS have been used to coat other materials in order to impart oil and water repellency, temperature resistance, and friction reduction to a wide range of consumer and industry products.

3.     3M first manufactured PFAS products beginning in the 1950s and continued to do so for decades thereafter. 3M used PFAS for its own finished goods, and also sold PFAS compounds as a raw material to other customers throughout the United States, including to manufacturers that used them as chemical feedstock or a processing aid in their own industrial operations.

4.     3M's PFAS compounds were used to create numerous consumer products, including stain repellants, clothing, furniture, food packaging, and heat-resistant non-stick cooking surfaces, as well as in a multitude of industrial applications, including the aerospace, automotive, building/construction, and electronics/semiconductor industries. Beginning in the 1960s, 3M also began to manufacture a firefighting foam using PFAS, known as Aqueous Film Forming Foam ("AFF Foam"), which has seen widespread adoption, including by the United States military, and continues to be widely used.

5.     The chemical properties of PFAS that make them useful in industry and consumer applications also cause PFAS to resist chemical break down into smaller components over time, making them very persistent in the environment, fish, animals, and the human body. The molecular bond resulting from the fluorination processes that create PFAS is one of the strongest molecular bonds ever discovered, leading to extreme chemical durability and resistance to being dissolved.

6.     PFAS created by 3M are being, and have been, released into the air, soil, and water, including sources of drinking water. Because PFAS are highly water soluble and do not stick to

2

soil particles, they readily seep through soil into groundwater, allowing PFAS to travel long distances.

7.     PFAS are also concerning because the compounds "bioaccumulate" in the tissue of living organisms over time, increasing in concentration, and also "biomagnify" in ecosystems, increasing in concentration as PFAS are passed on through higher levels in the food chain.  As a result of continued exposure to the chemicals and their insolvent nature, PFAS accumulate over time within the environment and within the fish, animals, and humans exposed to them.

8.     Although some PFAS have been manufactured for more than 50 years, PFAS were not widely documented in environmental samples until the early 2000s.  Beginning in roughly 2004, research began to indicate that PFAS had been distributed widely throughout sediments, surface and groundwater, through wildlife populations, and even in human blood.  By May 2016, the Environmental Protection Agency ("EPA") issued a Lifetime Health Advisory ("LHA") for certain PFAS in drinking water.  The LHA warning indicated that the presence of these PFAS in very small amounts in drinking water (as little as 70 parts per trillion ("ppt")) would produce adverse health effects in those who drank the water over the course of their lifetime.

9.     3M took only limited and haphazard precautions in its use and disposal of PFAS chemicals, products incorporating PFAS, and waste byproducts.  For example, PFAS and the waste byproducts created in the manufacturing processes were frequently disposed of in unlined dumps, and also discharged (through industrial wastewater) into waterways near their production facilities.  3M frequently disposed of PFAS and waste byproducts in unlined dumps or discharged PFAS and such waste byproducts into waterways in the vicinity of its production facilities.

10.     3M accumulated significant knowledge about the environmental and health risks PFAS represented for the decades while it produced PFAS.  Starting in the early 1960s, 3M became

3

aware that PFAS contained in chemical wastes dumped into landfills could leach into groundwater and otherwise enter the environment. And internal 3M memos indicate that the Company understood PFAS contamination would eventually reach the water table and pollute drinking water. Other contemporaneous 3M research showed the Company that its PFAS products were durable in the environment and would not degrade after disposal.

11.     In the late 1970s, 3M also concluded that PFAS were toxic to aquatic life, and that PFAS could impact human food sources by significantly reducing the survival rates of fish exposed to PFAS. 3M continued to research internally, but did not disclose to anyone outside the Company, the negative environmental and health impacts of PFAS into the 1970s and 1980s, including studies conducted on its industrial pollution and fish tissue taken from surrounding waters.

12.     In spite of this internal Company knowledge, for years 3M affirmatively marketed its AFF Foam as harmless to the environment. 3M represented in manufacturer presentations and literature that the foam was biodegradable. Upon learning that this was false, one customer wrote in a 1988 letter to 3M expressing "surprise and total shock" that 3M had been misrepresenting this attribute of AFF Foam. Internal 3M documents confirm that employees knew 3M was intentionally deceiving customers, with one employee stating that he did not "think it is in 3M's long-term interest to perpetuate the myth that these fluorochemical surfactants are biodegradable."

13.     3M also conducted research and was internally amassing knowledge regarding the potential harms exposure to PFAS posed to humans and animals. For example, studies in the 1950s indicated that PFAS levels built up in the bloodstream of mice, and that PFAS was fatal to those mice exposed. Another 1956 study found that PFAS binds to proteins in human blood, resulting in bioaccumulation of the compounds in the human body. Subsequent studies conducted by 3M in the 1960s and 1970s showed that PFAS was toxic and had negative health effects,

4

including harming internal organs, with research indicating some level of PFAS in blood serum samples taken from blood banks across the United States.

14.     By the end of the 1990s, 3M's corporate culture was such that disclosure of the true risks PFAS represented was impossible.  A 3M scientist raised red flags within the Company throughout the 1990s and attempted to assemble and finalize concrete risk assessments regarding the true dangers of PFAS.  However, he was met with "roadblocks, delays, and indecision" – as well as intentional obfuscation on the part of 3M officials.  Finally, rather than continuing on complicit in the Company's intentional cover-up, the scientist wrote a resignation letter to 3M as a corporate entity, disclaiming the Company's practices and explaining why the scientist felt that he needed to leave.

15.     3M finally released scientific data regarding PFAS to the EPA in 1998.  Years later, in 2006, the EPA cited 3M for hundreds of violations of the Toxic Substances Control Act for belatedly reporting "substantial risk information" under TSCA Section 8e.  The EPA fined 3M only $1.52 million for its deception – a tiny fraction of 3M's annual PFAS revenue.  Since that time, the number of independent scientific articles published on the health and environmental impacts of PFAS has exploded.  This subsequent research has linked the chemicals to a wide range of health effects in people, including testicular and kidney cancer, obesity, impaired fertility, thyroid disease, increased cholesterol and lipids in blood, immune system effects, and the early onset of puberty.

16.     As a result of PFAS' structure as a "forever chemical" that does not break down, the Company has been exposed to a multitude of regulatory developments and litigation regarding PFAS as a result of the massive environmental, human health, and other negative consequences from the chemicals.  The claims represented, and continue to represent, significant liability for 3M

arising out of its manufacture, distribution, and improper disposal of PFAS.  The claims include actions of the State Attorneys General of New Jersey, New York, Minnesota, Michigan, Wisconsin, Delaware, New Hampshire, and Maine, dozens of lawsuits relating to contamination at 3M's facilities for pollution to the surrounding areas, and hundreds of class actions and other lawsuits against 3M and others relating to the damages caused by PFAS contained in 3M's AFF Foam and other PFAS contamination.  These damages include injuries to health, property, and the environment in surrounding areas.  For instance, in order to settle claims brought by the Minnesota Attorney General, 3M incurred *$897 million* in liability related to PFAS for this single lawsuit covering damages to just Minnesota alone.

17.     In addition, securities fraud class actions filed beginning in July 2019 were consolidated into the Securities Action, alleging that 3M failed to acknowledge and account for the foregoing massive liabilities it was facing, in violation of §§10(b) and 20(a) of the Exchange Act.

18.     As a result of the conduct alleged in the Securities Action, 3M is likely to incur even further damages, including attorneys' fees and expenses, loss of reputation, and loss of business opportunities for failing to adequately disclose the liability facing the Company and taking an appropriate litigation reserve.  The Defendants here have breached their fiduciary duties for their participation and acquiescence in allowing the Company to make materially false and misleading statements in violation of the Federal Securities Laws.

19.     Plaintiff obtained internal 3M books and records pursuant to an inspection request conducted pursuant to 8 *Del. C.* §220 in furtherance of the litigation of these derivative claims.  ■

6

████████████████████████████████████████████████████████████

███████████████████████████████████████

20.   ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████ the eventual \$897 million settlement in the action brought by the Attorney General of

the State of Minnesota.   ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ the Director Defendants breached their fiduciary duties

to the Company in reviewing and approving the Company's financial statements, even as litigation

against the Company continued to skyrocket and the Company continued to incur further liabilities

related to PFAS.

## II.   JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange

Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1331 for the claims asserted herein for violations of

Section 14(a) of the Exchange Act.  This Court has supplemental jurisdiction over the remaining

claims under 28 U.S.C. §1367.  In connection with the acts, conduct, and other wrongs complained

of herein, Defendants directly, or indirectly, used the means and instrumentalities of interstate

commerce, the United States, and the facilitation of a national securities market.

22.     This Court has jurisdiction over each Defendant named herein, because each Defendant is either an individual or corporation that has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.  In addition, Nominal Defendant 3M conducts business in and maintains operations in this District.

23.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) one or more Defendants either resides in, or maintains, executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (ii) Defendants have engaged in numerous activities that have had an effect in this District.

## III.    PARTIES

### A.     Plaintiff

24.     Plaintiff Richard D. Tunick ("Plaintiff") is a 3M shareholder and has continuously held 3M stock since at least December 2005.  Plaintiff will fairly and adequately represent 3M's interests in this action.

### B.     Nominal Defendant

25.     Nominal Defendant 3M Company is a Delaware corporation headquartered at 3M Center, St. Paul, Minnesota 55144.  3M is a diversified technology company that manufactures products which it breaks down into its four business segments: (1) Safety and Industrial; (2) Transportation and Electronics; (3) Health Care; and (4) Consumer.

### C.     Director Defendants

26.     Defendant Thomas K. Brown ("Brown") has been a 3M director since 2013.  Brown also serves as a member of the Company's Audit and Nominating & Governance Committees. Brown signed the Company's 2016, 2017, 2018, and 2019 Forms 10-K filed with the SEC on February 9, 2017, February 8, 2018, February 7, 2019, and February 6, 2020, respectively.

27.     Defendant Pamela Craig ("Craig") has been a 3M director since 2019.  Craig also serves as a member of the Company's Audit and Science, Technology & Sustainability Committees.  Craig signed the Company's 2019 Form 10-K filed with the SEC on February 6, 2020.

28.     Defendant David B. Dillon ("Dillon") has been a 3M director since 2015.  Dillon also serves as the Chairman of the Company's Audit Committee and as a member of the Company's Nominating & Governance Committee.  Dillon signed the Company's 2016, 2017, 2018, and 2019 Forms 10-K filed with the SEC on February 9, 2017, February 8, 2018, February 7, 2019, and February 6, 2020, respectively.

29.     Defendant Michael L. Eskew ("Eskew") has been a 3M director since 2003.  Eskew also serves as a member of the Company's Nominating & Governance Committee.  Eskew signed the Company's 2016, 2017, 2018, and 2019 Forms 10-K filed with the SEC on February 9, 2017, February 8, 2018, February 7, 2019, and February 6, 2020, respectively.

30.     Defendant Herbert L. Henkel ("Henkel") has been a 3M director since 2007. Henkel also serves as the Chairman of the Company's Compensation Committee and as a member of the Company's Science, Technology & Sustainability Committee.  Henkel signed the Company's 2016, 2017, 2018, and 2019 Forms 10-K filed with the SEC on February 9, 2017, February 8, 2018, February 7, 2019, and February 6, 2020, respectively.

31.     Defendant Amy E. Hood ("Hood") has been a 3M director since 2017.  Hood also serves a member of the Company's Compensation and Science, Technology & Sustainability Committees.  Hood signed the Company's 2017, 2018, and 2019 Forms 10-K filed with the SEC on February 8, 2018, February 7, 2019, and February 6, 2020, respectively.

32.     Defendant Muhtar Kent ("Kent") has been a 3M director since 2013.  Kent also serves as the Chairman of the Company's Nominating & Governance Committee and as a member of the Company's Compensation Committee.  Kent signed the Company's 2016, 2017, 2018, and 2019 Forms 10-K filed with the SEC on February 9, 2017, February 8, 2018, February 7, 2019, and February 6, 2020, respectively.

33.     Defendant Dambisa F. Moyo ("Moyo") has been a 3M director since 2018.  Moyo also serves as a member of the Company's Audit and Nominating & Governance Committees.  Moyo signed the Company's 2018 and 2019 Forms 10-K filed with the SEC on February 7, 2019, and February 6, 2020, respectively.

34.     Defendant Gregory R. Page ("Page") has been a 3M director since 2016.  Page also serves as the Chairman of the Company's Science, Technology & Sustainability Committee and as a member of the Company's Audit Committee.  Page signed the Company's 2016, 2017, 2018, and 2019 Forms 10-K filed with the SEC on February 9, 2017, February 8, 2018, February 7, 2019, and February 6, 2020, respectively.

35.     Defendant Michael Roman ("Roman") has been a 3M director since 2018 and serves as the Chairman of the Board and Chief Executive Officer ("CEO") of the Company.  Roman previously served as the Company's Chief Operating Officer ("COO"), led 3M's largest business group, and was the Company's chief strategist.  Roman joined 3M in 1988 as a senior design engineer.  Roman spoke on 3M's behalf in releases, conference calls, and SEC filings.  Pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002, SEC Rule 13a-14(a), and 18 U.S.C. §1350, Roman certified the Company's Forms 10-K filed with the SEC on February 7, 2019 and February 6, 2020.  Roman also signed the Company's Forms 10-K dated February 7, 2019 and February 6, 2020.

36.     Defendant Patricia A. Woertz ("Woertz") has been a 3M director since 2016. Woertz also serves as a member of the Company's Compensation Committee and Science, Technology & Sustainability Committee.  Woertz signed the Company's 2016, 2017, 2018, and 2019 Forms 10-K filed with the SEC on February 9, 2017, February 8, 2018, February 7, 2019, and February 6, 2020, respectively.

### D.     Executive and Former Director Defendants

37.     Defendant Inge G. Thulin ("Thulin") served as 3M's Executive Chairman from July 2018 through June 2019, and as Chairman, President, and CEO from 2012 through June 2018. Prior to these positions, Thulin served as Executive Vice President and COO of 3M from 2011 through 2012, with responsibility for all of 3M's business segments and international operations. Thulin previously also served as Executive Vice President of International Operations from 2004 through 2011.  Thulin began work at 3M in Sweden in 1979.  Thulin spoke on 3M's behalf in releases, conference calls, and SEC filings.  Pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002, SEC Rule 13a-14(a), and 18 U.S.C. §1350, Thulin certified the Company's Forms 10-K filed with the SEC on February 9, 2017 and February 8, 2018.  Thulin also signed the Company's Forms 10-K dated February 9, 2017, February 8, 2018, and February 7, 2019.

38.     Defendant Nicholas C. Gangestad ("Gangestad") has served as 3M's Senior Vice President and Chief Financial Officer since 2014.  Gangestad retired from the Company, effective July 31, 2020.  Gangestad spoke on 3M's behalf in releases, conference calls, and SEC filings. Pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002, SEC Rule 13a-14(a), and 18 U.S.C. §1350, Gangestad certified the Company's 2016, 2017, 2018, and 2018 Forms 10-K filed with the SEC on February 9, 2017, February 8, 2018, February 7, 2019, and February 6, 2020, respectively. Gangestad also signed the Company's Forms 10-K dated February 9, 2017, February 8, 2018, February 7, 2019, and February 6, 2020.

11

39.     Defendant Ippo Vrohidis ("Vrohidis") has served in Vice President-level positions at 3M since April 2011.  Vrohidis further served as 3M's Vice President, Finance, Chief Accounting Officer and Corporate Controller from July 2017 until April 2019, when his title was changed to Vice President, Enterprise Program Management Office & Business Development. Vrohidis signed the Company's Forms 10-K dated February 8, 2018, and February 7, 2019.

40.     Defendant Teri Reinseth ("Reinseth") has served as a Vice President, Corporate Controller, and Chief Accounting Officer for the Company since March 2019.  Previously, Reinseth served as 3M's Director of Finance from March 2015 to March 2019, and before that, as a Finance Manager for the Company.  Her employment with the Company spans 15 years, with her Finance Manager position beginning July 2005.  Reinseth signed the Company's 2019 Form 10-K filed with the SEC on February 6, 2020.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     History of PFAS

41.     Per- and polyfluoroalkyl substances ("PFAS") are a group of man-made chemicals, including perfluorooctanoic acid ("PFOA"), perfluorooctanesulfonic acid ("PFOS"), hexafluoropropylene oxide ("HFPO"), "GenX" chemical compounds, and over 4,700 other chemicals in use on the global market.  PFAS have been manufactured and used in the United States since the 1940s, and are included in many consumer products such as firefighting foams, cookware, food packaging, waterproofing, and stain repellants.  PFAS have been used to coat other materials in order to impart oil and water repellency, temperature resistance, and friction reduction to a wide range of consumer and industry products.

42.     PFAS do not chemically break down into smaller components over time, making them very persistent in the environment, fish, animals, and the human body.  This is due to the chemical structure of PFAS on an atomic level.  Organic compounds typically have carbon atoms

12

bonded to hydrogen atoms. PFAS are created by substituting the hydrogen atoms with fluorine atoms, forming a resulting chemical bond between carbon and fluorine known as a "fluorochemical." If all hydrogen atoms are replaced with fluorine atoms, the resulting compound is fully fluorinated, or "perfluorinated."

43. The bond resulting from the fluorination process is one of the strongest molecular bonds ever discovered, leading to extreme chemical durability and resistance to being dissolved. However, this extreme durability also leads to the potential for extensive and persistent environmental contamination. Because PFAS are highly water soluble and do not stick to soil particles, they readily seep through soil into groundwater, allowing PFAS to travel long distances. Their extreme durability and resistance to degradation also ensures that they will remain in the environment for long periods of time.

44. Compounding this issue, municipal water treatment systems are not able to easily remove PFAS from drinking water, but instead require specialized and expensive remediation equipment to effectively draw PFAS out of contaminated waters. PFAS are, and have been, released into the air, soil, and water, including sources of drinking water. As a result of continued exposure to the chemicals and their insolvent nature, PFAS accumulate over time within the environment and within the fish, animals, and humans exposed to them.

45. PFAS are also concerning because the compounds "bioaccumulate" in the tissues of living organisms over time, increasing in concentration, and also "biomagnify" in ecosystems, increasing in concentration as PFAS are passed on through higher levels in the food chain.

46. The bioaccumulation of PFAS, as well as other qualities of the chemical, pose serious health risks to humans, other living organisms, and indeed, entire ecosystems. Humans may be exposed to PFAS through food, including through: contaminated soil and water used to

13

grow the food; food packaging containing PFAS; and equipment that has used PFAS to cook or process food. PFAS have also been used in commercially treated products that humans have had direct contact with, such as stain- and water-repellent or nonstick goods, including carpets, leather and apparel, textiles, paper and packaging materials, and non-stick cookware. Humans may also be exposed to PFAS through the disposal and biodegradation of consumer products that contain PFAS.

47.     PFAS are manufactured through several different processes. Two of the widest-known PFAS chemicals with the largest distributions are the compounds PFOS (perfluorooctane sulfanate) and PFOA (perfluorooctanoic acid), both of which have fluorine atoms attached to the eight carbon atoms that form the "backbone" of their molecular structures. PFAS with eight carbon atoms are sometimes referred to as "C8" in reference to this chain of eight carbon atoms. PFAS with six or more carbon atoms are sometimes called "long-chain" PFAS, while those with fewer are considered "short-chain" PFAS.

48.     Although some PFAS have been manufactured for more than 50 years, PFAS were not widely documented in environmental samples until the early 2000s. Beginning in roughly 2004, research began to indicate that PFAS had been distributed widely throughout sediments, surface and groundwater, through wildlife populations, and even in human blood. As research advanced in the early 2000s, PFAS began to be discovered across the globe, with some studies indicating that PFAS can be found even in areas well beyond where they were initially used or manufactured.

49.     By May 2016, the EPA issued a Lifetime Health Advisory ("LHA") for two of the most widely detected PFAS – PFOA and PFOS – in drinking water. The LHA warning indicated that the presence of PFOA and/or PFOS in very small amounts in drinking water (as little as 70

14

ppt) would produce adverse health effects in those who drank the water over the course of their lifetime. Since that time, six additional types of PFAS have been included for monitoring by the EPA, as they are suspected to also be present in drinking water in amounts significant enough to require monitoring for contamination. Many state regulatory agencies now also require testing for an expanded list of PFAAs.

**B.    The Company's Production and Sale of PFAS**

50.    3M first licensed the chemical process it used to create PFAS, electrochemical fluorination ("ECF"), in the 1940s. 3M manufactured PFAS products using this ECF method beginning in the 1950s and continued to do so for decades thereafter. For many years, 3M was the sole manufacturer of PFOS in the United States, and a major manufacturer of PFOA.

51.    3M used PFAS for its own finished goods. 3M also sold PFAS compounds as a raw material to other customers throughout the United States, including to manufacturers that used them as chemical feedstock or a processing aid in their own industrial operations. For instance, 3M for decades sold PFOA to E.I. du Pont de Nemours & Company ("DuPont") which, in turn, used PFOA in the manufacture of its ubiquitous Teflon products.

52.    3M's PFAS compounds were used to create numerous consumer products, including stain repellants, clothing, furniture, food packaging, and heat-resistant non-stick cooking surfaces, as well as in a multitude of industrial applications, including the aerospace, automotive, building/construction, and electronics/semiconductor industries. Beginning in the 1960s, 3M also began to manufacture a firefighting foam using PFAS, known as Aqueous Film Forming Foam ("AFF Foam"), which has seen widespread adoption, including by the United States military, and continues to be widely used.

53.    3M took only limited and haphazard precautions in its use and disposal of PFAS chemicals, products incorporating PFAS, and waste byproducts. For example, PFAS and the waste

15

byproducts created in the manufacturing processes were frequently disposed of in unlined dumps, and also discharged (through industrial wastewater) into waterways near their production facilities.

54.     As a result, 3M contaminated the environment near its facilities, and at hundreds of sites throughout the country and abroad.  Virtually the entire human population was also exposed en masse to these PFAS chemicals as a result.

## C.     Decades-Long Internal Company Knowledge of the Deleterious Environmental Impacts of PFAS

55.     3M accumulated significant knowledge about the environmental and health risks PFAS represented for the decades while it produced PFAS.  For example, in the early 1960s, 3M became aware that PFAS contained in chemical waste dumped into landfills could leach into groundwater and otherwise enter the environment.  A 3M internal memo from 1960 described 3M's understanding that such contamination "[would] eventually reach the water table and pollute domestic wells."   Other contemporaneous 3M research showed the Company that its PFAS products were durable in the environment and would not degrade after disposal.

56.     In addition, a 1970 letter from a potential 3M customer to a technical journal regarding 3M's AFF Foam noted that the Company's own tests of the substance resulted in effects that were "highly derogatory to marine life," and that even at the lowest concentrations, "erratic motion, loss of stability, and other visibly odd effects were present [in fish]."  A 1974 report from the U.S. Navy expressed similar concern over its practice of releasing "a large raft of snow-white [AFF Foam]" into harbors, despite 3M's assurances to the Navy that the PFOS-based foam would have no adverse effect on the environment.

57.     3M's internal studies confirmed these concerns regarding negative effects on aquatic life.  A 3M study from 1977 concluded that PFAS were toxic to aquatic invertebrates.  And in a technical report from 1979, 3M scientists confirmed that the Company's PFAS substances had

"potential for widespread distribution in the environment," were "completely resistant to biodegradation," and "would be expected to persist in the environment for extended periods of time." As a result, the scientists concluded that the PFAS they studied could "impact . . . human food source[s] by significantly reducing the survival rates" of fish exposed to PFAS.

58.    3M continued to research internally, but not disclose to anyone outside the Company, the negative environmental and health impacts of PFAS into the 1970s and 1980s. During these decades, the Company studied the effect of PFAS in the environment, including in surface water and in the plants and animals exposed to industrial pollution from PFAS and its waste byproducts. For instance, a 1979 internal 3M report drew a direct correlation between waste emanating from 3M's Decatur, Alabama plant and fluorochemicals bioaccumulating in fish tissue taken from the Tennessee River. In 1983, 3M scientists internally opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."

59.    In spite of this internal Company knowledge, for years 3M affirmatively marketed its AFF Foam as harmless to the environment. 3M represented in manufacturer presentations and literature that the foam was biodegradable. Upon learning that this was false, one customer wrote in a 1988 letter to 3M expressing "surprise and total shock" that 3M had been misrepresenting this attribute of AFF Foam. Internal 3M documents confirm that employees knew 3M was intentionally deceiving customers, with one employee stating that he did not "think it is in 3M's long-term interest to perpetuate the myth that these fluorochemical surfactants are biodegradable," and that "[i]t is probable that this misconception will eventually be discovered, and when that happens, 3M will likely be embarrassed, and we and our customers may be fined and forced to immediately withdraw products from the market."

17

60.     In 1999, a 3M environmental specialist also voiced concerns that PFAS was damaging to the environment and living things.  He concluded, based on his research, that PFAS was "probably more damaging than PCB [polychlorinated biphenyl, a long-banned toxic and carcinogenic industrial chemical] because it does not degrade, whereas PCB does."  The researcher further concluded that PFAS was "more toxic to wildlife" than PCB, because its end point in the environment appeared to be plants and animals, not soil and sediment, as was the case with PCB. As was confirmed at a 2002 Federal Aviation Conference, the fluorinated surfactants in AFF Foam were among the most environmentally persistent substances ever – "impervious to biological and most chemical assault."

## D.     Decades-Long Internal Company Knowledge of Negative Health Impacts of PFAS

61.     As 3M continued to mass produce PFAS and sell them to its customers, 3M's research conducted by its own scientists (as well as those from DuPont) began internally amassing knowledge regarding the potential harms exposure to PFAS posed to humans and animals.  For example, a 1950 3M study on mice revealed that PFAS levels built up in the bloodstream.  A 1954 study on the toxicity of PFAS showed that it was fatal to rats and mice, who died after exposure to both PFOS and PFOA.  A 1956 study found that PFAS binds to proteins in human blood, resulting in bioaccumulation of the compounds in the human body.

62.     The research continued into the 1960s.  In 1961, a DuPont toxicologist warned that PFAS chemicals enlarged rat and rabbit livers, while another DuPont study published four years later showed increased liver and kidney weight and increased spleen size in rats due to exposure to the chemicals.  A 1963 3M internal technical manual deemed its PFAS compounds to be toxic chemicals, and a 1966 3M study confirmed the "acute oral toxicity" of the substance in rats.  A DuPont toxicologist warned that the chemicals should be "handled with extreme care," and that

contact with the skin should be "strictly avoided." Despite this internal knowledge, 3M and DuPont continued to develop new uses for PFAS and increase production of products utilizing PFAS.

63.     In 1968, after PFAS had been in mass production for nearly two decades, independent academic researchers published findings that showed the presence of fluorine in human blood, but were unable to identify the specific compounds. Years later, in 1975, 3M was approached by academic researchers with questions as to whether 3M's Scotchgard or other PFAS-containing products (such as Teflon) might be the source of these foreign compounds in human blood. At that time, 3M denied and deflected the inquiry, even after its own subsequent internal research confirmed PFOA to be at least one component of this organic fluorine.

64.     Beginning in 1976, 3M began to internally investigate its own employees' exposure to fluorochemicals, to gauge the health effects on its workforce. DuPont also began monitoring its own employees for this purpose, in 1978. Almost immediately, 3M discovered that the blood of employees at its plants in Minnesota, Illinois, and Alabama showed PFOA levels up to 1,000 times normal levels. The Company also found PFOA in blood serum samples taken from blood banks across the United States. Internally, 3M considered the possibility that its products were one source of the PFAS chemicals now widely dispersed in the blood of nearly every person in the country.

65.     3M had already learned that PFOA caused changes in rats' livers at levels lower than those measured in some of its workers. In response, 3M "urgently recommended that all reasonable steps be taken to reduce exposure of employees to these compounds," and nonetheless decided that its findings "should not be reported [to the EPA] at this time."

66.     3M conducted further clandestine research in the late 1970s showing that PFAS were toxic to living things.  A 1978 study, for instance, showed that PFOA and PFOS were toxic to monkeys, pursuant to which all monkeys given PFOS-contaminated food died within the first few days of the study.  In another study, monkeys given PFOA developed tiny lesions on organs central to maintaining the body's immune defenses.  Again, 3M decided not to report any of these results to the EPA or otherwise make these results public.  DuPont, for its part, became aware of 3M's findings by no later than 1981, and had been conducting its own studies into the implications of PFAS exposure on its workforce at the time.

67.     In 1979, 3M sought confidential advice from a well-known external toxicologist regarding the foregoing findings.  The toxicologist noted that the Company's research regarding workers who had been exposed to PFAS showed "indications of liver effects" and suggested that 3M determine whether PFAS "or its metabolites are present in man, what level they are present, and the degree of persistence (half-life) of these materials."  The toxicologist further emphasized that further research was "of utmost importance" because 3M "could have a serious problem." Later that same year, a 3M scientist echoed the toxicologist's recommendations, writing in an internal 3M memo that "it is paramount to begin now an assessment of the potential (if any) of the long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long term chronic exposure."

68.     3M took a telling precautionary measure in 1981: reassigning "approximately 25 women of childbearing potential" from the Company's Decatur, Alabama PFAS manufacturing plant to prevent the workers' continued exposure to PFAS.  This action was taken in response to further internal toxicology studies, indicating PFAS exposure was linked to birth defects in rat

fetuses. No further actions were taken to either publish the results of the study, provide additional safety measures for 3M workers, or to reexamine the Company's widespread use of PFAS.

69.    As a result of 3M's failure to act on this decades-long research, by 1984, 3M's continuing internal testing showed that fluorochemicals were steadily bioaccumulating in the bodies of its employees. 3M did nothing to curtail PFAS production and distribution, nor to inform its customers or the public about the dangers posed by PFAS, despite internal correspondence urging that the Company "must view this . . . trend with serious concern."

### E.    3M's Attempts to Downplay and Cover-Up Research into, and Actual, PFAS-Related Biological and Environmental Damage

70.    3M responded to its internal knowledge of the hazards associated with PFAS exposure by purposefully concealing the animal studies and other research and findings the Company sponsored on the topic. 3M successfully suppressed the negative health and environmental impacts of PFAS for decades. Indeed, much of the research was only released to the EPA for the first time in 1998. And, on multiple occasions, 3M worked to suppress or downplay its own researchers' findings regarding the risks attached to PFAS exposure.

71.    For one example, the Company's 1978 studies exposing monkeys to PFAS showed that PFOA-exposed monkeys developed tiny lesions on their spleens, lymph nodes, and bone marrow (all organs central in maintaining the body's immune defenses). A follow-up review recommended that "lifetime rodent studies should be undertaken as soon as possible." In turn, at a 1983 internal meeting of 3M's Fluorochemical Study Committee, a member of the toxicology team listed "immunosuppressive effects" as one of three areas of follow-up research that should be given highest priority, according to notes for the meeting. Yet, as other 3M researchers noted, nearly a decade later, "no follow-up studies of these observations have been reported." In addition,

3M failed to report its findings to the EPA, its customers, or the public at large, choosing to keep knowledge of these troubling findings under wraps.

72.     3M research conducted in 1992 confirmed the deleterious effects PFAS had on humans, yet was similarly kept from the public. A 1992 research paper regarding the health effects of PFOA on 115 male workers at one 3M plant showed, among other findings, that workers who had at least 10 years of exposure to PFOA had a death rate from prostate cancer that was over triple that of workers who had not been exposed to PFOA. This research confirmed the findings of a 1983 joint 3M/DuPont study that deemed PFOS to be a carcinogen, and an internal 1989 3M study that showed that cancer rates among the Company's PFAS-exposed employees were elevated compared to the general population, with especially elevated rates for prostate cancer. 3M conducted three additional studies regarding the carcinogenic impact of PFAS exposure, but did not publish any of the three follow-up papers to the 1992 research.

73.     By the end of the 1990s, 3M's corporate culture was such that disclosure of the true risks PFAS represented was impossible. A 3M scientist raised red flags within the Company throughout the 1990s and attempted to assemble and finalize concrete risk assessments regarding the true dangers of PFAS. However, he was met with "roadblocks, delays, and indecision" – as well as intentional obfuscation on the part of 3M officials. Finally, rather than continuing to be complicit in the Company's intentional cover-up, the scientist wrote a resignation letter to 3M as a corporate entity, disclaiming the Company's practices and explaining why the scientist felt that he needed to leave. The text of the resignation letter reads as follows:

28 March 1999

To: 3M

I resign my position as Environmental Specialist effective 6 April 1999. My resignation is prompted by my profound disappointment in 3M's handling of the environmental risks associated with the manufacture and use of perfluorinated

sulfonates (PFOS) (CAS# 29081-56-9) and its precursors, such as ethyl FOSE alcohol (CAS #1691-99-2) and methyl FOSE alcohol (CAS #24448-09-7).

Perfluorooctanesulfonate is the most insidious pollutant since PCB. It is probably more damaging than PCB because it does not degrade, whereas PCB does; it is more toxic to wildlife; and its sink in the environment appears to be biota and not soil and sediment, as is the case with PCB.

I have worked within the system to learn more about this chemical and to make the company aware of the dangers associated with its continued use. But I have continually met roadblocks, delays, and indecision. For weeks on end I have received assurances that my samples would be analyzed soon--never to see results. There are always excuses and little is accomplished. I can illustrate with several examples.

- For more than twenty years 3M's ecotoxicologists have urged the company to allow testing to perform an ecological risk assessment on PFOS and similar chemicals. Since I have been assigned to the problem a year ago, the company has continued its hesitancy.

- Over a period of seven months I made frequent requests that ecological risk consultants be hired to help me plan toxicity testing, environmental sampling, chemical fate studies, and ecological risk procedure. I still have not received authorization even to bring people in to interview.

- I requested, very frequently, over a nine-month period, a sample of chemical to send out for fate property and ecotoxicity testing. Finally[,] I was provided with one that apparently the division had all along.

- I put together a pioneer risk assessment on PFOS that indicated a greater than 100% probability of harm to sea mammals, based on preliminary data on the concentration of PFOS in menhaden fish meal. The 8e committee [referring to the Toxic Substances Control Act of 1976 Section 8e ("TSCA 8e"), requiring reporting to the EPA for chemical materials that represent a "substantial risk"] told me that they would like to reconsider the assessment after we had a validated value for fishmeal. That analysis was given high priority by the committee. After three months the analysis is still not done--not because there were technical problems, but because management did not actually give the analysis high priority.

- 3M submitted a TSCA 8e last May. There is tremendous concern within EPA, the country, and the world about persistent bioaccumulative chemicals such as PFOS. Just before that submission we found PFOS in the blood of eaglets-- eaglets still young enough that their only food consisted of fish caught in remote lakes by their parents. This finding indicates a widespread environmental contamination and food chain transfer and probable bioaccumulation and bio-magnification. This is a very significant finding that the [TSCA] 8e reporting

rule was created to collect. 3M chose to report simply that PFOS had been found in the blood of animals, which is true but omits the most significant information.

- One of our customers, Griffin, has data on some of our chemicals. They developed this data for pesticide registration purposes. I started regularly asking for permission to visit Griffin and view the data last May. Their data can help us plan our studies of similar chemicals. It can also indicate if there is an unforeseen risk to certain biota or via certain exposure pathways. It was ten months before I was allowed to visit Griffin, at which time I did not get to see the data. I have to return another time to see it.

- 3M waited too long to tell customers about the widespread dispersal of PFOS in people and the environment. We knew before May of 1998, yet 3M did not start telling customers until January of 1999. I felt guilty about this and told customers I personally knew earlier. Still, it was not as early as it should have been. I kept waiting for 3M to do its duty, as I was continually assured that it would. Some of the customers have done risk assessments on the PFOS precursor they use. They assume there is not a background in the environment and in wildlife. Since there is a background, their risk assessments are inaccurate. Thus they can make inappropriate business decisions and not realize that their use of PFOS precursors contributes to an aggregate risk.

- 3M continues to make and sell these chemicals, though the company knows of an ecological risk assessment I did that indicates there is a better than 100% probability that perfluorooctanesulfonate is biomagnifying in the food chain and harming sea mammals. This chemical is more stable than many rocks. And the chemicals the company is considering for replacement are just as stable and biologically available. The risk assessment I performed was simple, and not worst case. If worst case is used, the probability of harm exceeds 100,000%.

- 3M told those of us working on the fluorochemical project not to write down our thoughts or have email discussions on issues because of how our speculations could be viewed in a legal discovery process. This has stymied intellectual development on the issue, and stifled discussion on the serious ethical implications of decisions.

I have worked to the best of my ability within the system to see that the right actions are taken on behalf of the environment. At almost every step, I have been assured that action will be taken—yet I see slow or no results. I am told the company is concerned, but their actions speak to different concerns than mine. I can no longer participate in the process that 3M has established for the management of PFOS and precursors. For me it is unethical to be concerned with markets, legal defensibility and image over environmental safety.

Sincerely,

Rich Purdy

74. Internal Company emails further show, in Mr. Purdy's words, the "roadblocks, delays, and indecision" from 3M with regard to earnestly researching and reporting the adverse health and environmental impacts of PFAS. It was 3M's refusal to engage with Mr. Purdy, after he had raised his findings and complaints to Thomas DiPasquale ("DiPasquale"), who is still 3M's Assistant General Counsel, which eventually prompted Mr. Purdy's resignation. In the days leading up to Mr. Purdy's resignation, Mr. Purdy's email exchange with DiPasquale, dated March 26, 1999, was forwarded to other 3M researchers to explain the Company's lack of action. As the exchange reads:

Georjean:

It has been more than 3 months since we reviewed Rich's hypothesis on food chain contamination. At that time we decided there was insufficient data to support a submission. What is the status of obtaining data to either support or refute the need to report?

Tom [DiPasquale]:

Georjean, I'm not sure there is a need to support or refute the hypothesis within any particular time frame. If I recall correctly, the work was itself not part of our formal plan for assessment of environmental exposure. There are many other theories circulating within the company about the paths of exposure, but we cannot undertake extensive efforts to confirm or refute them in each instance. As we discussed earlier this week, a comprehensive exposure assessment plan, with timetables, milestones, objectives, etc.[,] should be our guiding document. This will be needed both for the EPA and for our own purposes. If in the judgment of those who are managing the environmental exposure project the Purdy hypothesis deserves consideration, then it should be incorporated into the comprehensive plan, assigned a priority, and given the necessary resource allocation. I don't see it as standing alone or separate from the broader plan.

Tom

*Rich's response to Tom:*

Plan! That is the same stalling technique you have been using for the last year. There is a high probability that PFOS is killing marine mammals and you want another plan when we could have had data to support the risk assessment long ago.

You were given a plan in 1983.  Again in the early 90s.  And you authorized no testing.

As I recall we obtained data that eaglets contain PFOS in their plasma last April.  Then you as part of an upper management team dispersed the team that initiated the collecting of that data as part of their plan.  And then you said we had to put together a plan under the Battelle umbrella.  As of now we still have not gotten any data because of that tactic.  Battelle is an albatross around our necks and so are you.

Preliminary data indicates that adult eagles have 50 times as much in their plasma than [sic] those eaglets.  We could have gotten that data and more last summer if we were not stuck planning with Battelle.  Don't you realize we have a plan.  You continually ignore our plans and start new plans that slows [sic] the collection of data essential for our risk assessments.  You slow our progress in understanding the extent of PFOS pollution and damage.  For 20 years the division has been stalling the collection of data needed for evaluating the environmental impact of fluorochemicals.

PFOS is the most onerous pollutant since PCB and you want to avoid collecting data that indicates that it is probably worse.  I am outrage [sic].

## F.   3M Belatedly Reports Its Findings to the EPA and Ceases Production of PFOS and PFOA

75.     3M finally released scientific data regarding PFAS to the EPA in 1998.  Years later,

in 2006, the EPA cited 3M for hundreds of violations of the Toxic Substances Control Act for

belatedly reporting "substantial risk information" under TSCA 8e.  The EPA fined 3M only $1.52

million for its deception – a tiny fraction of 3M's annual PFAS revenue.  Since that time, the

number of independent scientific articles published on the health and environmental impacts of

PFAS has exploded.  This subsequent research has linked the chemicals to a wide range of health

effects in people, including testicular and kidney cancer, obesity, impaired fertility, thyroid

disease, increased cholesterol and lipids in blood, immune system effects, and the early onset of

puberty.

76.     In 2000, following disclosure of its PFAS research to the EPA, 3M announced that

it would begin to phase out production of its long-chain PFAS (*i.e.*, PFOS and PFOA) in response

to pressure from the agency and in the face of mounting evidence of widespread contamination

and the accompanying health risks. 3M continues to manufacture other, "short-chain" PFAS products as replacements for PFOS and PFOA in some of its products. 3M asserted that its "products are safe" and cited its "principles of responsible environmental management" when it announced its plan to cease production of PFAS. Yet, the EPA simultaneously warned that the data supplied by 3M "indicated that these chemicals [PFAS] are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term." The EPA also indicated that it would have banned 3M's long-chain PFAS had 3M not taken voluntary action.

77.     As a result of the backlash and necessity of phasing out long-chain PFAS, 3M vacated certain markets and product areas. For other markets, 3M developed an alternative to its eight-carbon-long chain PFOS chemicals, and has created a four-carbon-long chain chemical called "PFBS" (perfluorobutane sulfonate). While PFBS and other PFAS have a significantly shorter half-life in human blood than the older long-chain PFAS compounds, thus reducing their potential for bioaccumulation, their long-term health impacts remain unknown.

G.      **3M Continues to Produce PFAS, and Faces Ongoing Fallout for the Extensive, Long-Lasting, and Ongoing Damage PFAS Has Caused to the Environment and Living Things**

78.     3M's belated disclosure of its research concerning PFAS led to increasing regulatory scrutiny from both state and federal agencies, as well as a growing number of lawsuits from those who had been exposed and were later able to link their ailments with PFAS and products containing PFAS, and those who were now confronted with the fact that their lands and waters had been contaminated and would need to undergo extensive remediation.

79.     Knowledge of the intense liability 3M was generating by continuing to manufacture and release PFAS into the environment was reported directly to the Board as early as April 24, 2007. For instance, in a presentation titled, "Request for Response Actions Board Presentation,"

toxicologists, environmental health experts, and a remediation director all presented to 3M's Board concerning 3M's disposal sites at "Chemolite/Cottage Grove, Oakdale, and Woodbury" – 3M industrial plants located in Minnesota that 3M touts as being "like a small city." The presentation went on to detail the five determinations needed to establish liability under the Minnesota Environmental Response and Liability Act ("MERLA"): "(1) There is a Release; (2) There is a Facility; (3) The Release or Threatened Release is from the Facility; (4) The Release Involves Hazardous Substances; and (5) 3M Is a Responsible Person as Defined by MERLA." The presentation went through each element and concluded that 3M was responsible for releasing PFOA and PFOS at each of the sites and that, according to 3M's own internal investigation not released to the public, each of the elements was met for liability under MERLA.

80.     With culpable Board knowledge that PFAS would continue to build up in the environment and in the bodies of living organisms, 3M continued to dump waste directly into the ecosystem, even into 2008. For instance, internal Company emails between members of 3M's "Environmental, Health and Safety Operations" team indicate that the Company continued to dump certain PFAS chemicals directly into open waters, even after the Company stopped manufacturing these chemicals for sale due to the potential harm they would cause. On January 1, 2008, a manager in 3M's Environmental, Health, Safety, and Regulatory group of its Materials Resource Division wrote to 3M Vice President Jean Sweeney:

> I was contacted yesterday by a manager in building 236 whose employee attended the 3M meeting about the Woodbury water. There was a statement made at the meeting that the employee became very concerned about and felt compelled to discuss with his manager who informed me. The statement was something to the effect that "3M no longer produces PFOA, PFOS[,] and PFBA [perfluorobutanoic acid]." The part that is of concern to the employee is the PFBA. The fact is, 3M continues to generate PFBA in fairly large quantities in Cordova as a by-product that is constituent in our waste water that is directly discharged into the Mississippi River.

> This may be a matter of semantics, however, I promised to pass on the concern.

In response, 3M Vice President Jean Sweeney wrote:

> Thank you for your comment.  I appreciate your bringing this to my attention.  Others have raised this, also.  It is not correct for me to state that 3M no longer manufactures PFOA, PFOS, or PFBA.  It is more accurate for me to state that we no longer manufacture these chemicals for sale.  It is true that, for instance, PFBA is a by-product in the waste stream from some of our current PFC manufacturing.  I will amend my statement at the public meeting in accordance with this.

> Your feedback is exactly the reason why we first do the presentation with our employees before we present to the public – so that inconsistencies can be caught and corrected.

> Again, thanks for raising this issue.

Nowhere in the emails was there a discussion of any action to stop the Company from dumping PFAS chemicals directly into the Mississippi River.  Instead, the email exchange shows that these 3M employees were concerned solely with carefully crafting statements made at public meetings to avoid culpability, and not in reforming the Company's practices of dumping toxic, non-degradable chemicals into open waters.

81.     Though 3M has ceased production of many of its most notorious PFAS chemicals, because they do not break down in the environment and can build up in animal and human tissues, these chemicals continue to pose hazards long after their release into the environment.  This is particularly true in areas that continue to show extremely high levels of PFAS in groundwater due to decades of industrial discharges into drinking water sources, or near military installations or airports where PFAS-laden AFF Foam was used.

82.     As a result of PFAS' structure as a "forever chemical," the Company has been exposed to a multitude of regulatory developments and litigation regarding PFAS as a result of the massive environmental, human health, and other negative consequences from the chemicals.

1.     Increasing Regulation as a Result of Growing Public Knowledge Regarding the Hazardous Properties of PFAS

83.     The EPA released a preliminary risk assessment report for PFOA acknowledging the substance's hazardous and dangerous properties in 2005.  However, the report was also criticized for discounting or ignoring significant scientific findings indicating that PFOA increased risks for heart attack, stroke, breast cancer, testicular cancer, and numerous other health harms. The report was also criticized for failing to consider the effects that PFOA has on the immune system, seemingly without justification.

84.     The EPA continued to act on PFAS by reaching agreements with eight major PFAS manufacturers, including 3M, beginning in 2006 to completely phase out long-chain PFOA and PFOS by 2015.  However, the agreements were voluntary and unenforceable.  The EPA would not set standards for levels of PFAS in drinking water until 2009, when it created an "action plan" establishing 400 ppt for PFOA and 200 ppt for PFOS as screening levels for further examination into potential risk from exposure in drinking water.  To demonstrate how miniscule is the amount of PFAS chemicals required in drinking water to be dangerous to human life, one ppt is equivalent to one drop of water in 20 Olympic-sized swimming pools.

85.     Unfortunately, due to 3M's knowing misfeasance, the levels of PFAS present in waters were orders of magnitude greater than the EPA's testing limits.  For instance, at a contamination site tested near Atlantic City, New Jersey, AFF Foam-related contamination was tested as high as 95,000 ppt for PFOS and 41,000 ppt for PFOA.

86.     It would not be until May 2016 that the EPA would re-evaluate its 2009 PFOS/PFOA action plan and issue its "Drinking Water Health Advisory for [PFOS and PFOA]" (the "2016 Health Advisory").  The 2016 Health Advisory significantly reduced its guidance for the level of PFAS present in drinking water to be safely consumed over the course of a lifetime, to a limit of 70 ppt.  This limit superseded provisional levels established in 2009 of 300 to 400 ppt.

87.     This reduction in advisory levels significantly expanded the areas considered contaminated by 3M.  As the Office of Environment, Health, Safety, and Security of the Department of Energy explained, "[t]his numerical reduction [in the 2016 Health Advisory for safe levels of PFAS in drinking water] significantly increased the number of water systems impacted."

88.     As the number of water systems impacted increased, 3M's potential liability for environmental damage was also similarly enlarged.  Significantly, the enhanced 70 ppt limit affected eight facilities in Alabama where 3M had significant PFAS manufacturing capability, including: West Morgan-East Lawrence Water Authority; Gadsden Water Works & Sewer Board; Centre Sewer Board; Vinemont Anon West Point Water Systems, Inc.; West Lawrence Water Co-op; Northeast Alabama Water District (in Fort Payne); Southside Water Works and Sewer Board (in Gadsden); and The Utilities Board of Rainbow City.

89.     3M's facilities in Decatur, Alabama were especially significant, as the center was a "major producer" of PFAS.  Significantly, 3M failed to comply with the requirements regarding discharges from this facility for a decade.  As would only later be uncovered in 2019, and leading to a federal grand jury subpoena on the Company in January 2020, 3M's Decatur Alabama facilities illegally discharged FBSA (perfluorobutane sulfonamide, an intermediate chemical used in the manufacture of long-chain PFAS) into the Tennessee River from December 2009 until at least June 2019.  These discharges led to the contamination of Decatur's nearby Brookhaven Middle School, which became so contaminated that it had to be shut down.  3M was forced to buy the property back from the Decatur Board of Education, but did not buy back an adjacent Aquadome Recreation Center, which had also been contaminated.  As of May 2020, Decatur officials reportedly were considering whether to sue to force 3M to clean up the PFAS-contaminated areas and seek recovery for the contamination.

90.     Compounding these illegal acts and 3M's inability to come into lawful compliance, 3M later disclosed in January 2020 that similar releases involving FBSA "may have" occurred at a plant in Cordova, Illinois.  State authorities governing natural resource management in Michigan, Illinois, and Wisconsin have reportedly taken action to coordinate with the EPA in response to investigate whether the areas affected maintain safe drinking water, and to determine the level of PFAS contamination in their respective states.

91.     However, in 2016, none of 3M's practices of dumping waste into local waters was known outside the Company.  Instead, a Harvard University study, published on August 19, 2016, in the journal *Environmental Science and Technology Letters*, found that the drinking water of 6 million Americans, including people in West Virginia, Kentucky, and Ohio, contained significant amounts of PFAS.  The study noted that PFAS-contaminated water was also detected in water supplies all over the United States, including in almost the entirety of New Jersey and most of Eastern Pennsylvania.  The study found the following widespread contamination of drinking water in the U.S. by PFAS:



92.     On the heels of the publication of this research, the *Minneapolis Star Tribune* also reported in August 2016 that 80 households in Washington County, Minnesota – yet another of 3M's manufacturing and disposal centers for PFAS – were forced to resort to bottled water and filtration systems in light of the risks posed by PFAS-contaminated groundwater. According to the article, the PFAS levels found in Washington County's drinking water at the time exceeded the EPA's newly-established federal safety standards, long contaminating the groundwater in the area.

93.     In March 2017, New Jersey's Department of Environmental Protection released a report with its recommendation for a maximum contaminant level for PFOA in drinking water. The recommendation was based on years of scientific research and included a public comment period throughout 2016. The report found that "PFOA was the most frequently detected PFC [perfluorinated compound, and umbrella term to describe many fluorinated chemicals] and was found in samples from approximately 60% of the 80 [New Jersey public water systems] tested."

33

94.     Instead of coming forward and taking responsibility for its part in the contamination of vast numbers of water systems across the United States and the related environmental impacts, 3M repeatedly maintained that it had acted as an "environmental steward" at this time, and denied its irresponsible activity with respect to the continued manufacture of PFAS.  For instance, in 3M's 2017 Sustainability Report, published annually on the Company's website for activity during fiscal year 2016, 3M stated that "[w]e have been setting global environmental goals [at 3M] since 1990. A strong part of our company history, these goals have helped dramatically reduce our own environmental footprint and established [3M] as a leader in environmental stewardship."  Similar statements were again made in 3M's 2018 Sustainability Report for fiscal year 2017, wherein 3M claimed "environmental stewardship is a core corporate commitment backed by decades of proven performance."

2.     3M Faces Increasing Legal Liability as the Extent of the Harm from Decades of PFAS Contamination Is Uncovered

95.     As a result of the foregoing, 3M, DuPont, and other customers engaged in manufacturing with PFAS products faced significant liability from lawsuits related to the harms caused by PFAS and its byproducts.  The claims represented significant liability for 3M arising out of its manufacture, distribution, and improper disposal of PFAS.

96.     3M manufactured PFAS compounds at, *inter alia*, its Cottage Grove industrial facilities in Minnesota, and chemical plants located in Decatur, Alabama, and Cordova, Illinois. 3M also manufactured PFAS overseas at sites in Antwerp, Belgium and Gendorf, Germany.  As a result, the Company is defending a host of lawsuits and engaged in remediation efforts in connection with the manufacture, distribution, and disposal of PFAS and its byproducts that occurred at those sites.

34

97.     In 2002, current and former employees of 3M's plant in Decatur, Alabama (where Scotchgard was long produced) sued the Company for personal injuries tied to their exposure to toxic chemicals. Though the complaint was dismissed in 2005, an amended complaint was filed for those with property damage claims in the vicinity of the Decatur plant. A second Alabama lawsuit was filed in 2004, this one by residents near the Decatur plant who alleged that PFAS chemicals from the plant contaminated their soil and groundwater, lowering their property values. And a third suit related to the Decatur plant was filed in 2009, seeking relief for those whose property was contaminated by PFAS.

98.     In 2008, 3M entered into a voluntary remedial action agreement with the Alabama Department of Environmental Management ("Alabama DEM") to address the presence of PFCs in the soil at 3M's manufacturing facility in Decatur, Alabama. Pursuant to a permit issued by the Alabama DEM, the Company had previously incorporated its wastewater treatment plant sludge containing PFCs in fields at its Decatur facility for approximately twenty years.

99.     3M also produced PFAS at its Cottage Grove, Minnesota facility from the late 1940s until 2002. PFOA was the main type of PFAS manufactured at this site. According to the Minnesota Department of Health ("MDH"), "[t]he water treatment plant on site that processed water from production activities did not remove PFAS, so PFAS [was] in the waste water that went into the Mississippi River." In addition, according to records kept by the MDH related to PFAS sites in Minnesota, environmental testing shows that the groundwater beneath the 3M Cottage Grove site is contaminated with PFOA and other PFAS, including PFOS and PFBA. The levels of PFAS for some areas exceeded MDH criteria for safe levels in drinking water.

100.    In August 2014, the Illinois EPA approved a request by the Company to establish a groundwater management zone at its manufacturing facility in Cordova, Illinois. According to

35

3M filings, the responsibilities include ongoing pumping of impacted site groundwater, groundwater monitoring, and routine reporting of results.

101.    Since 2015, numerous other lawsuits have been filed against 3M and other PFAS manufacturers and customers for claims related to, *inter alia*, PFAS contamination of Alabama's waterways, additional remediation required to remove PFAS from municipal water supplies, and the damage caused by PFAS to public health and property.

102.    For example, in October 2015, West Morgan-East Lawrence Water and Sewer Authority ("WMELA") filed individual and class action claims against 3M and others in the U.S. District Court for the Northern District of Alabama, seeking compensatory and punitive damages and injunctive relief for contamination of the Tennessee River from chemicals, including PFAS produced from 3M's manufacturing processes in Decatur, Alabama. The complaint alleged that the chemicals could not be removed by the water treatment processes utilized by WMELA, compounding the harm. In September 2016, 3M's motion to dismiss the claims was partly denied, with negligence claims for property damage, public nuisance, abatement of nuisance, battery, and wantonness surviving.

103.    In June 2016, Tennessee Riverkeeper, Inc., commenced a lawsuit in the U.S. District Court for the Northern District of Alabama against 3M and others for violating the Resource Conservation and Recovery Act in connection with the unlawful disposal of certain PFCs through 3M's ownership and operation of certain sites in Tennessee. On February 10, 2017, 3M's motion to dismiss was denied in its entirety.

104.    On July 25, 2016, *The New York Times* published an article addressing PFAS contamination at U.S. military bases in connection with 3M's AFF Foam. The article explained that, "Defense Department officials initially identified about 700 sites of possible contamination,

but that number has surged to at least 2,000, most of them on Air Force bases."  Jennifer Feld, a professor at Oregon State University and an expert on the chemistry of AFF Foam, was quoted in the article as stating that, with respect to contaminated water from AFF Foam, "[i]t's quite possible it will touch every state."  The article further noted that three Colorado communities, with a combined population of approximately 60,000 people, tested at twice, three times, and nearly 20 times above the 70 ppt guideline that had recently been set by the EPA in May 2016.

105.    In January 2017, several hundred plaintiffs – who receive their water from WMELA – sued 3M, a subsidiary, Dyneon, and others in the counties of Lawrence and Morgan, Alabama for manufacturing and disposal out of facilities in Decatur, Alabama that released, and continue to release, PFOA, PFOS, and related chemicals into the groundwater and surface water of the sites surrounding the facilities, and further resulting in discharge into the Tennessee River. The suit asserted common law claims for negligence, nuisance, trespass, wantonness, and battery, as well as claims for injunctive relief and punitive damages.  A similar putative class action was filed against 3M, Dyneon, and others in November 2017.

106.    On February 13, 2017, DuPont and other companies agreed to pay $671 million to settle thousands of personal injury lawsuits regarding negative health impacts from exposure to PFOA.  On the same day, *The Wall Street Journal* published an article entitled, "DuPont Settlement of Chemical Exposure Case Seen as 'Shot in the Arm' for Other Suits."  The article noted that the massive $671 million settlement was reached midway through the trial of a pipe fitter who had been diagnosed with testicular cancer from PFOA-contaminated water.  The article further noted that the jury had been presented with "dozens of internal DuPont documents to argue that the Company knew of the health risks of PFOA to residents and how difficult it is for the body to rid itself of the chemical."

37

107.    In May 2017, the Water Works and Sewer Board of the Town of Centre, Alabama (the "Centre Sewer Board") filed a lawsuit in the Circuit Court of Cherokee County, Alabama against 3M, DuPont, and various carpet and textile manufacturers.  The Centre Sewer Board contended that PFCs from 3M and the other defendants' facilities contaminated the town's water source for drinking water.  The complaint sought unstated damages for the installation and operation of a water filtration system, expenses to monitor PFC levels, lost profits and sales, and injunctive relief.

108.    In addition, hundreds of class actions and other lawsuits have been filed against 3M and others relating to the damages caused by PFAS contained in 3M's AFF Foam that was used at airports, refineries, military bases, and firefighter and fire training facilities.  These damages include injuries to health, property, and the environment in surrounding areas.  The AFF Foam cases were consolidated in late 2018 into a multi-district litigation (the "AFF Foam MDL") pending in the United States District Court for the District of South Carolina.  Several other AFF Foam-related suits are also pending in several state courts.

### 3.    State Attorneys General File Suit Against 3M

#### a.    New Jersey

109.    One such suit consolidated into the AFF Foam cases MDL was filed by the Attorney General of the State of New Jersey, Gurbir Grewal (the "NJAG Action").  As noted above in ¶93, by 2016 New Jersey experienced widespread PFAS contamination across virtually all of its waterways.  The NJAG Action was filed in May 2019, bringing claims of strict liability for design defects and the failure to warn, negligence, public nuisance, and violations of New Jersey's Consumer Fraud Act (the "NJCFA").  Specifically, the NJAG Action alleged injury to New Jersey from 3M's, DuPont's, and other manufacturers' PFOS, PFOA, and AFF Foam products, including widespread contamination of the natural resources of New Jersey, including its groundwater,

surface water, sediments, soils, and biota.  New Jersey, through its Attorney General, also alleged that 3M committed deceptive and fraudulent business practices in connection with its advertisement, offer for sale, and sale of AFF Foam to New Jersey state government entities, counties, municipalities, and local fire departments.

110.    The NJAG Action further alleged that affected entities included county fire training academies, and potentially hundreds of local fire departments that purchased and used these products to perform public services, and sought to require 3M to pay all costs necessary to investigate, remediate, assess, and restore the sites in New Jersey where AFF Foam was transported, stored, used, handled, released, spilled, and disposed, as well as all of the off-site areas and natural resources that have been contaminated by AFF Foam.

111.    As noted in the NJAG Action, New Jersey had imposed even stricter groundwater criteria for PFOS and PFOA than the 70 ppt guideline proposed by the EPA in 2016: on March 13, 2019, the New Jersey Department of Environmental Protection ("NJDEP") proposed rules establishing maximum contaminant levels and groundwater quality standards for PFOS of 13 ppt, and for PFOA of 14 ppt.  A single AFF Foam product used for its intended purpose during a training event, however, would release thousands of gallons of PFAS-laced water into the environment.  While investigation of AFF Foam-contaminated areas in New Jersey is ongoing, as of the date of the filing of the NJAG Action, many military facilities had been confirmed contaminated, including Joint Base McGuire-Dix-Lakehurst in Burlington and Ocean Counties; Naval Weapons Station Earle in Monmouth County; the Naval Air Warfare Center in Trenton, which includes a nearby research facility and airport; and the Federal Aviation Administration William J. Hughes Technical Center in Atlantic County, with more widespread contamination across New Jersey expected.

112.     In addition to the military sites where PFAS contamination had been measured, NJDEP released a study of 11 waterways in New Jersey in 2018, entitled "Investigation of Levels of Perfluorinated Compounds in New Jersey Fish, Surface Water, and Sediment." The study found significant contamination in three bodies surrounding Joint Base McGuire-Dix-Lakehurst, including in groundwater, surface water, sediment, and biota. An additional study sampling areas of Joint Base McGuire-Dix-Lakehurst further found some groundwater wells had levels of PFOS and PFOA as high as 264,300 ppt, and surface water showing combined levels as high as 8,830 ppt. Sampling of drinking water off-site of three private drinking water wells also revealed PFOS and PFOA levels ranging from 152 ppt to 1,688 ppt. Finally, local fish populations exhibited levels of PFOS so severe that NJDEP issued advisories for certain species to be consumed no more than once per year, or not at all.

113.     Further studies sampling groundwater in 2014 and 2016 uncovered further PFOS and PFOA concentrations in fire training areas, including concentrations as high as 95,000 ppt for PFOS and 41,000 ppt for PFOA. The effect on surface water, groundwater, and drinking water supplies that the area served was ongoing and the overall harm unknown. Testing of off-site private wells near known contaminated areas also revealed PFOS and PFOA groundwater levels at concentrations well above the established limits.

114.     In reaction to the filing of the New Jersey case, 3M issued a statement claiming that the Company "acted responsibly in connection with PFAS and will vigorously defend its record of environmental stewardship."

### b. Minnesota

115.     On December 30, 2010, the Attorney General for the State of Minnesota, Lori Swanson, filed a lawsuit in Hennepin County District Court against 3M to recover damages for injury to, destruction of, and loss of use of certain of the State's natural resources under MERLA

(the "Minnesota AG Action"). The lawsuit also asserted statutory nuisance and common law claims of trespass, nuisance, and negligence with respect to the presence of PFAS in the groundwater, surface water, fish or other aquatic life, and sediment. Minnesota alleged that the Company "in pursuit of profit, deliberately disregarded the substantial risk of injury to the people and environment of Minnesota from its continued manufacture of PFC's [sic] and its improper disposal . . ."

116.     The Minnesota AG Action alleged that, for over 50 years, 3M produced PFCs for a variety of consumer, commercial, and industrial products, including stain repellents like Scotchgard, fire retardants, stain removers, paints, hydraulic fluids, semiconductors, and other chemical products. Instead of properly disposing of PFCs and their waste byproducts, however, 3M polluted Minnesota ground and surface water, causing injury to the natural resources of Minnesota. The pollution came from waste sites at industrial facilities located in Cottage Grove; Oakdale; Woodbury; and the Washington County Landfill in Lake Elmo. Minnesota further noted that 3M was the sole manufacturer of PFOS in the United States, and a major manufacturer of PFOA for the duration of the alleged wrongdoing.

117.     The harm to Minnesota was extensive. Over 100 square miles of groundwater have been contaminated by 3M's disposal of PFCs, affecting four major aquifers: the St. Peter, Prairie du Chien, Jordan, and Franconia aquifers, which are the source of residential drinking water for tens of thousands of Minnesotans. And as 3M's own internal studies of its employees showed, PFOA exposure held a positive association with prostate cancer, cerebrovascular disease, and diabetes. Because of high levels of PFOS found in the tissues of fish from certain parts of the Mississippi River and from Lake Elmo, the Minnesota Pollution Control Agency also had to declare these areas as "impaired" under Section 303(d) of the federal Clean Water Act, 33 U.S.C.

§1313(d), because these areas no longer met applicable water quality standards and fish from these areas were no longer safe for human consumption.

118.    3M's own assessments also noted that the PFCs it disposed of impacted soil, groundwater, surface water, sediments, biota, and both private and public nearby drinking water wells in Minnesota.  As a result, the residents of the eastern metropolitan area of the Twin Cities showed elevated PFC levels in blood tests when compared to the U.S. population as a whole.  In the context of research from 2007, showing that high concentrations of PFCs harm the liver and thyroid and further lead to developmental problems related to pregnancies, the harm to Minnesota's public health is vast.  Minnesota further alleged that 3M conducted extensive further research, which granted it vast internal knowledge on the negative impact of PFCs on human health and the environment.

119.    As the Minnesota AG Action makes clear, 3M was not authorized or permitted by the State to release and discharge PFCs into groundwater and surface water.  To the contrary, as soon as research began to be published showing the public harms of PFAS, Minnesota established standards starting in 2002 for PFOA and PFOS in drinking water, and later in 2007 for additional health risk limits ("HRLs") establishing limits for PFOA and PFOS in groundwater.  Further, 3M was never granted authorization from the Minnesota Pollution Control Agency to discharge PFCs into the waters of Minnesota, and such discharge was carried out in direct contravention of existing Minnesota law.  According to Minnesota, the harm 3M caused was ongoing and had not been remediated by the Company.

120.    The Minnesota AG Action was resolved by an agreement and consent order entered into on February 20, 2018 (the "Settlement Agreement").  Pursuant to the Settlement Agreement, 3M agreed to pay $850 million to Minnesota, which was held in grant for a Water Quality and

Sustainability Fund.  The grant is to be used to cover costs, fees, and expenses for projects to enhance the quality, quantity, and sustainability of the drinking water affected by 3M.  The remedial measures required are extensive, including the need to provide alternative drinking water sources for some municipalities, the treatment of existing water supplies, projects designed to recharge groundwater stores, and projects to allow individual residences to connect to non-contaminated municipal water supplies.

121.    In addition to the $850 million immediate penalty, 3M was also required to provide up to an additional $40 million over five years after entry into the Settlement Agreement for certain "temporary" water treatment solutions until the long-term remedial actions contemplated in the Settlement Agreement could be implemented.

122.    The agreement included no corporate governance reforms or other palliative remediations at the Company.

            *c.      Other States*

123.    3M has also been targeted by other state Attorneys General outside of New Jersey and Minnesota for its role in contamination caused by the Company's PFAS products.  The states of New York and Ohio (in June and December of 2018, respectively) each filed lawsuits against 3M and others seeking to recover the costs incurred in responding to contamination caused by AFF Foam.  These cases were also transferred to the AFF Foam MDL.  In reaction to the filing of the New York AFF Foam case, a 3M spokesperson claimed that it had "acted responsibly at all times and will defend its record of stewardship in connection with its manufacturing and sale of AFF Foam."

124.    In 2019, additional suits were filed by the states of New York (which filed two actions, one in February and one in July 2019), New Jersey (which filed two actions in March 2019), New Hampshire (which filed two actions in May 2019), and Vermont (which filed two

actions in June 2019).   The claims were brought against 3M and others related to PFAS contamination.

125.    The New Hampshire actions, filed in May 2019 against 3M and others for PFAS contamination, are similar to the prior claims filed by other Attorneys General in that they also seek damages for PFAS contamination.  As in New Jersey, PFAS contamination was found across the State, in all ten counties and with significant exposure to large towns like Merrimack and Portsmouth, which had caused families to resort to the use of bottled water.  New Hampshire Attorney General Gordon MacDonald stated in connection with the filing of the actions, "[i]t is my hope that those responsible for the manufacture and distribution of PFAS will recognize the severity of the issues they've caused and will become part of the solution."

126.    Michigan and other states are also soliciting proposals for outside legal expertise in pursuing claims against manufacturers, distributors, and other responsible parties related to PFAS contamination.

### 4.    Securities Fraud Class Action Claims

127.    Following on the substantial liabilities 3M incurred as a result of the Minnesota State AG Action, as well as the potential liabilities presented by the foregoing outstanding public injury claims, two securities fraud class actions were filed against the Company beginning in July 2019.   These actions were consolidated into the Securities Action, alleging that 3M failed to acknowledge and account for the massive liabilities it was facing, in violation of §§10(b) and 20(a) of the Securities Exchange Act of 1934.

128.    The Securities Action alleges that, as a result of the foregoing allegations made by the several states described herein, 3M and its executives knew by no later than February 2017, if not earlier, that the Company was facing massive liabilities for its manufacture, distribution, and disposal of PFAS, but failed to even partially acknowledge these liabilities until at least 2019.

129.    As the Securities Action alleged, until the $850 million settlement announced in the Minnesota AG Action, 3M's recorded liabilities for all environmental-related liabilities (not just those limited to PFAS) was only $28 million – merely a fraction of the settlement value of just this one lawsuit.  More specifically, the Company's Form 10-K for the year ended December 31, 2017, indicates that 3M had reserved only $28 million for estimated "environmental remediation," with an additional $25 million reserved for "other environmental liabilities."

130.    In September 2017, the State of Minnesota had submitted its expert report in the case against 3M, contending that the State had suffered $5 billion in damages.  Notwithstanding Minnesota's damages analysis, and a December 2017 ruling that Minnesota could go forward with discovery on the issue of punitive damages, however, 3M never recorded a reserve for the case.  It was only in connection with the announcement of the Settlement Agreement that 3M would later book a pre-tax charge of $897 million, inclusive of legal fees and other related obligations, in the first quarter of 2018 in connection with the resolution of the Minnesota AG Action.

131.    Soon after the Settlement Agreement was announced, the Attorney General for the State of Minnesota posted a trove of internal Company emails and memoranda produced by 3M during the litigation, which had never been published previously.  These materials first made clear that 3M was aware as far back as the 1970s (and possibly earlier) that PFAS pose a serious risk to public health.  The documents also confirmed that, for decades, 3M withheld this information from state and federal regulators.

132.    Immediately following 3M's announcement of the Settlement Agreement, on April 27, 2018, the SEC wrote to 3M asking the Company to explain how it was possible that the Company's annual Form 10-K for the year ended December 31, 2017, which was filed less than

two weeks before the $850 million settlement was announced, did not record any charge for the

Minnesota AG Action:

> You disclose [on February 8, 2018] that as of December 31, 2017 you had not
> recorded any liability related to the Minnesota Environmental Litigation because
> you believed any such liability was not probable and estimable. However, we note
> from your Form 8-K dated February 20, 2018 that you settled the lawsuit on that
> day for $850 million. Please address the following:
>
> • Please provide us with your analysis of [Accounting Standards
>   Codification] ASC 450-20-25 and ASC 450-20-30 in determining that no
>   loss contingency accrual relating to this action was required as of December
>   31, 2017. Clearly explain to us why the loss contingency was not probable
>   and estimable as of that date.
>
> • Tell us how you considered the guidance in ASC 855 – Subsequent Events
>   – in concluding on your disclosures relating to this matter in this Form 10-
>   K, which was filed with us on February 8, 2018.

133. On May 8, 2018, 3M responded to the SEC's April 27, 2018, letter by asserting,

*inter alia*, that "because any liability arising from this litigation was neither probable nor estimable,

or if estimable had a low end of the range of $0, the Company concluded that no accrual for this

matter was required in its financial statements for the period ended December 31, 2017." In

addition, 3M asserted that "[b]etween December 31, 2017 and February 8, 2018" – the date the

Company's annual report on Form 10-K was filed – "no event or development occurred in the

litigation that changed the Company's view of the case as of the balance sheet date or as of the

date the Company filed its Form 10-K."

134. As the Securities Action alleges, 3M continued to downplay and otherwise fail to

acknowledge the extent of the liability that PFAS represented for the Company. In April 2019, for

instance, 3M's reserve established for the Settlement Agreement with Minnesota was merely $235

million. A press release from the Company explained that this reserve was meant to cover global

remediation at five manufacturing plants, including in Alabama, Illinois, and Minnesota in the

U.S., and in Belgium and Germany. Specifically, in the April 25, 2019, Press Release, the

Company announced it had "established a reserve of $235 million to resolve certain environmental matters and litigation, in which 3M is a defendant, related to its historical manufacture and disposal of PFAS-containing waste."

135. The $235 million reserve recorded was much larger than the paltry amounts previously recorded by the Company:

| As of: | Recorded Liabilities for "Other Environmental Liabilities" | Recorded Liabilities for "Environmental Remediation" |
|---|---|---|
| December 31, 2016 | $29 million | $38 million |
| March 31, 2017 | $29 million | $36 million |
| June 30, 2017 | $28 million | $36 million |
| September 30, 2017 | $27 million | $38 million |
| December 31, 2017 | $25 million | $28 million |
| March 31, 2018 | $54 million | $31 million |
| June 30, 2018 | $59 million | $30 million |
| September 30, 2018 | $69 million | $29 million |
| December 31, 2018 | $59 million | $25 million |

136. As the Securities Action noted, the response from analysts was immediate and concerning. Given the Company's longstanding understatement of its PFAS liabilities, analysts questioned whether the Company's new $235 million reserve was only the tip of the iceberg, explaining that "[w]e are now seeing a pattern of less than expedient disclosure," that "[w]e view the PFAS . . . disclosure approach as now a red flag," and that "we fear that the $235m reserve increase taken in 1Q will continue to grow over time."

137. Even though 3M had exponentially increased its reserves, stunning investors and exposing the falsehood of the Company's earlier statements concerning 3M's PFAS liability, this change was clearly not enough to cover 3M's mounting liabilities with respect to PFAS. Analysts at Deutsche Bank, J.P. Morgan, and RBC Capital Markets all expressed skepticism that a $235 million reserve would be adequate in the face of the nearly $900 million settlement attained by the State of Minnesota. J.P. Morgan, for example, "expect[ed] a parade of settlements and charges

47

into future years," and "question[ed] why, if these do turn out to be several billion dollars, we are excluding them from [earnings per share] as they will likely run through [free cash flow]. . . ."

138.   As a result of the foregoing, in April 2019, 3M's common stock plummeted significantly, and has not recovered.  Specifically, 3M stock fell from $219.08 per share on April 24, 2019, to close at $190.72 per share on April 25, 2019 – a decline of $28.36 per share, or 13%. This was the worst daily performance for 3M's common stock since 1987, wiping out more than $16 billion in the Company's market capitalization in a single day.

139.   The next day, April 26, 2019, 3M and the WMELA announced settlement of litigation pending in the U.S. District Court for the Northern District of Alabama relating to 3M's production of PFAS at a plant in Decatur, approximately 10 miles upstream from WMELA's water treatment plant.  The settlement included a new filtration system at WMELA, so that it could continue to supply safe drinking water that had filtered PFAS out in accordance with applicable guidelines without passing on costs to the public.  According to local reports, the plans for the enhanced filtration system at the WMELA plants included a reverse osmosis system, which could cost as much as $43 million, consistent with information submitted to the Alabama Department of Environmental Management.

140.   The Securities Action also targets as false and misleading 3M's risk disclosures and environmental liabilities and environmental law compliance disclosures made in its annual report on Forms 10-K for the years ended December 31, 2016, 2017, and 2018; and quarterly reports made on Forms 10-Q for the periods ended March 31, 2017 (Q1 2017), June 20, 2017 (Q2 2017), October 31, 2017 (Q3 2017), March 31, 2018 (Q1 2018), June 30, 2018 (Q2 2018), September 30, 2018 (Q3 2018), and April 26, 2019 (Q1 2019).  The Securities Action further identified false and misleading statements made by Defendants Thulin, Roman, and Gangestad at earnings and other

conference calls regarding outstanding environmental liabilities and the Company's accounting for such liabilities.

> *a.   Materially False and Misleading Risk Factor Warning*

141.   Despite actual knowledge of internal studies and documents evidencing the toxicity of PFAS dating back to the 1970s, as well as its awareness (or reckless disregard) of the potentially massive legal liability for releasing PFAS into the environment since at least the 1960s, 3M's (Form 10-K) annual reports contained only one statement related in any way to its potential legal exposure in its Form 10-Ks.  The 2018 Form 10-K statement read as follows:

> The Company's future results may be affected by various legal and regulatory proceedings and legal compliance risks, including those involving product liability, antitrust, intellectual property, environmental, the U.S. Foreign Corrupt Practices Act and other anti-bribery, anti-corruption, or other matters.  The outcome of these legal proceedings may differ from the Company's expectations because the outcomes of litigation, including regulatory matters, are often difficult to reliably predict.  Various factors or developments can lead the Company to change current estimates of liabilities and related insurance receivables where applicable, or make such estimates for matters previously not susceptible of reasonable estimates, such as a significant judicial ruling or judgment, a significant settlement, significant regulatory developments or changes in applicable law.  A future adverse ruling, settlement or unfavorable development could result in future charges that could have a material adverse effect on the Company's results of operations or cash flows in any particular period.  For a more detailed discussion of the legal proceedings involving the Company and the associated accounting estimates, see the discussion in Note 16 "Commitments and Contingencies" within the Notes to Consolidated Financial Statements.

142.   The sole change to the risk warnings between 2016 and 2019 was to adjust the reference number of the note to the consolidated financial statements addressing legal proceedings in the last sentence.  Accordingly, the risk warning was a generic "catch-all" provision that was not tailored to 3M's actual known legal exposure.

> b. *Materially False and Misleading Environmental Law Compliance*
> *Disclosures*

143.   3M's statement regarding the Company's Environmental Law Compliance remained identical in the 2016, 2017, 2018, and 2019 Annual Reports on Form 10-K, other than slightly rephrasing and adding clerical edits to the year and the amount expended on capital projects related to protecting the environment in the third paragraph.   The Environmental Law Compliance section of the 2019 Form 10-K stated as follows:

**Environmental Law Compliance**

3M's manufacturing operations are affected by national, state and local environmental laws around the world.  3M had made, and plans to continue making, necessary expenditures for compliance with applicable laws.  3M is also involved in remediation actions relating to environmental matters from past operations at certain sites (refer to "Environmental Matters and Litigation" in Note 16, Commitments and Contingencies).

Environmental expenditures relating to existing conditions caused by past operations that do not contribute to current or future revenues are expensed. Reserves for liabilities for anticipated remediation costs are recorded on an undiscounted basis when they are probable and reasonably estimable, generally no later than the completion of feasibility studies, the Company's commitment to a plan of action, or approval by regulatory agencies.  Environmental expenditures for capital projects that contribute to current or future operations generally are capitalized and depreciated over their estimated useful lives.

In 2019, 3M expended approximately $59 million for capital projects related to protecting the environment.  This amount excludes expenditures for remediation actions relating to existing matters caused by past operations that do not contribute to current or future revenues, which are expensed.  Capital expenditures for environmental purposes have included pollution control devices – such as wastewater treatment plant improvements, scrubbers, containment structures, solvent recovery units and thermal oxidizers – at new and existing facilities constructed or upgraded in the normal course of business.  The Company places consistent emphasis on environmental responsibility.  While capital expenditures (other than for remediation projects) for known projects are presently expected to be approximately $150 million to $220 million over the next two years for new or expanded programs to build facilities or modify manufacturing processes to minimize waste and reduce emissions, 3M cannot predict with certainty whether future costs of such cleanup activities, capital expenditures or operating costs for environmental compliance will have a material effect on its capital expenditures, earnings or competitive position.

144.    These statements were materially misleading because, while statements regarding

the effect of environmental compliance on 3M's capital expenditures and earnings did not change

from the 2016 Form 10-K through the 2019 Form 10-K, the Defendant possessed actual knowledge

of the increasing scrutiny of, and litigation related to, PFAS, including the detailed knowledge

described *infra* §VI.

<em>c.    Environmental Matters and Litigation</em>

145.    In addition, the Company repeatedly released notes to its commitments and

contingencies disclosures for "Environmental Matters and Litigation" which failed to accurately

reflect the internal knowledge of escalating PFAS liability described *infra* §VI.  The Defendants

breached their fiduciary duties to the Company in failing to ensure that 3M was accurately

disclosing its internal knowledge of PFAS liability.

5.     3M Issues Further False and Misleading Statements as Lawsuits
       Representing Billions in Liability Mount into 2019

146.    Even after this loss, however, 3M decided to continue to issue false and misleading

statements regarding the impact of the Company's knowing use of dangerous PFAS chemicals and

the resultant damages to the Company.  On May 15, 2019, Defendant Gangestad claimed that

liability for 3M's manufacture and distribution of PFAS was "ring-fenced" by the $235 million

reserve the Company had recently taken.  Specifically, Gangestad stated, in pertinent part:

> On PFAS, the ring-fence I would call it is [sic] ring-fenced around liability around
> our 5 manufacturing sites and disposal of PFAS.  Because that's a view where we
> looked at all the discussions going on in all of the sites, all the litigation and putting
> our best estimate together of what we think all of those costs will be.  So that
> portion, I would call ring-fenced.

147.    Some outside the Company, in contrast, took a more realistic view of the

Company's liabilities after surveying the broad swath of litigation facing the Company.  For

instance, on June 6, 2019, Barclays analysts issued a report summarizing the state of litigation

against 3M and estimating its exposure related to the production and distribution of PFAS.  The

report estimated that 3M's potential liabilities could top $5 billion for PFAS, stating as follows:

> As the longest standing upstream PFAS manufacturer, the breadth of potential
> liabilities potentially facing MMM is quite large; in total we estimate a probability
> weighted total PFAS liability of $5bn.  For the basis of this discussion we have split
> the liabilities into four buckets.
>
> (i) MMM manufacturing sites and the impact on state resources (Barclays estimate
> for the probability weighted potential liability - $0.6bn)
>
> (ii) MMM manufacturing sites and the impact on individuals (Barclays estimate for
> the probability weighted potential liability - $0.4bn)
>
> (iii) Consolidated MMM product use cases – military bases (Barclays estimate for
> the probability weighted potential liability - $0.2bn)
>
> (iv) Consolidated MMM product use cases – broader population (Barclays estimate
> for the probability weighted potential liability - $3.7bn)

148. After Gangestad made his pronouncement that 3M's liability had been "ring-fenced" by its \$235 million reserve, the Company announced the possible presence of PFAS in three closed municipal landfills that accepted waste from the Company's Decatur, Alabama plant in the 1960s through the 1980s. In a press release on July 8, 2019, the Company announced that, "for the past several months, 3M has been conducting a thorough search for former landfills in Morgan and Lawrence Counties [Alabama] to test for any waste that may include PFAS."

149. 3M also stated that it was conducting an internal investigation, which was expanding to include other sites at its Decatur facility that had been involved in the manufacturing of PFAS. The City of Decatur and Morgan County officials requested that the Company focus its efforts on disposal sites in Brookhaven, Deer Springs, and Old Moulton Road/Mud Tavern, to which 3M agreed.

150. By November 2019, 3M confirmed that sites in Morgan County had been contaminated with PFAS as a result of the Company's activities. As reported by local news station *WAFF 48*, an official with Tennessee Riverkeeper subsequently appeared on local news and stated that 3M was "overwhelmed by the mess they had made, and we have to force them to clean it up [because] they don't know the extent of the damage they have caused." Another local news station, *WHNT News 19*, noted that this was not the first time the Company had been less than forthcoming with clean-up efforts: 3M had previously had a "chemical discharge conversion error" in its quarterly reports ranging from 2012 to 2016. As a result, 3M discharged substantially more chemicals into the Tennessee River than it had originally reported.

151. Analysts also noted that 3M's legal woes related to PFAS were continuing to multiply, despite the Company's refusal to adequately update its disclosures on the subject. On August 5, 2019, Wolfe Research issued an analyst report titled "Absorbing PFAS into Our

Numbers," and provided commentary on the "expanding risk of PFAS-related settlements" that 3M is facing. Wolfe Research discussed 3M's PFAS-related litigation, writing that, "[a]t this stage, our major concern is the expanding body of State AG litigation given that 3M has set a precedent via its settlement with MN." Overall, Wolf Research estimated that, "liability could be somewhere in the $5-6bn range."

152.    The next day, J.P. Morgan issued an analyst report echoing the sentiment that 3M had significant undisclosed liabilities. The report criticized 3M's approach to disclosure, writing that while the Company had announced that an internal investigation for potential FCPA violations in China had been initiated, there was no mention about it on the Company's earnings call held the day before. Then J.P. Morgan went on to write the following regarding the Company's insufficient PFAS disclosure:

> We view the PFAS and FCPA disclosure approach as now a red flag. We don't know how it ultimately gets resolved, but as an objective observer of various news reports and judging by recent federal hearings, PFAS continues to look to us like a material issue, one for which disclosure in the filings continues to grow, rendering a hard line company defense almost out of touch. Moving beyond PFAS, there was a new disclosure on compliance matters, freshly disclosed in the [Form] 10Q though not brought up on the 2Q call a mere day prior, around which the company initiated an internal investigation for potential FCPA violations in China. We think this is a negative on its own, though coming a day after earnings, on a summer Friday afternoon, is concerning. This comes after the company recorded its $850 mm PFAS charge, merely a week after the [Form] 10K was filed containing a <$100 mm reserve. We are now seeing a pattern of less than expedient disclosure, always a negative, and the approach to these items is a hit to confidence in management, which we were not willing to acknowledge previously, despite growing investor angst around the loss of control around the narrative both fundamentally and around these increasingly serious issues.

153.    Following the analysts voicing these concerns, on September 19, 2019, 3M announced that it had decided to "idle" manufacturing of a PFC at its plant in Decatur. According to a report filed the same day by *WAFF 48* in connection with 3M's announcement, an official with Tennessee Riverkeeper explained that, "the fluoropolymer manufacturing process results in

PFAS chemical runoff." In the *WAFF 48* report, the official further expounded that 3M, "keep[s] wanting to study it further and talk about how complicated it is and how long it's going to take to clean it up. It's a lot of talk and not a lot of action."

154.    As of the last quarter of 2019, the lawsuits 3M faced only continued to expand in number.    Attorneys General in Ohio, Vermont, and Guam brought suit against 3M for environmental harms to their respective regions, while an investigation was announced in Michigan, adding to the mounting legal liability facing the Company from the States.  According to one estimate, 3M has also been named in 304 individual cases related to PFAS environmental litigation in Alaska, New York, Michigan, and Maine alone.

155.    As of April 28, 2020, the date of the Company's last quarterly filing, the Company had not taken any additional charges to account for PFAS liability beyond the $235 million charge taken in April 2019.

## V.    MATERIALLY FALSE AND MISLEADING PROXY STATEMENTS

### A.    The 2017 Proxy Statement

156.    On March 22, 2017, the Company filed a proxy statement with the SEC on Form DEF 14A (the "2017 Proxy Statement").  The 2017 Proxy Statement identified the persons who were being nominated for director positions in connection with the Company's annual meeting of shareholders, which was held on May 9, 2017.

157.    The 2017 Proxy Statement referenced, among other things, 3M's "Code of Business Conduct and Ethics for Directors," stating, in relevant part, that, "[t]he Board also has adopted a Code of Business Conduct and Ethics for Directors of the Company.  This Code incorporates long-standing principles of conduct the Company and the Board follow to ensure the Company's business and the activities of the Board are conducted with integrity and adherence to the highest ethical standards, and in compliance with the law."

158.    The 2017 Proxy Statement contains a section regarding the "Board's Role in Risk

Oversight," which states:

> The Board has delegated to the Audit Committee through its charter the primary responsibility for the oversight of risks facing the Company including cybersecurity.  The Audit Committee's charter provides that the Audit Committee shall "discuss policies and procedures with respect to risk assessment and risk management, the Company's major risk exposures and the steps management has taken to monitor and mitigate such exposures."

> The Vice President and General Auditor, Corporate Auditing (the "Auditor"), whose appointment and performance is reviewed and evaluated by the Audit Committee and who has direct reporting obligations to the Committee, is responsible for leading the formal risk assessment and management process within the Company.  The Auditor, through consultation with the Company's senior management, periodically assesses the major risks facing the Company and works with those executives responsible for managing each specific risk.  The Auditor periodically reviews with the Audit Committee the major risks facing the Company and the steps management has taken to monitor and mitigate those risks.  The Auditor's risk management report, which is provided in advance of the meeting, is reviewed with the entire Board by either the chair of the Audit Committee of the Auditor.  The executive responsible for managing a particular risk may also report to the full Board on how the risk is being managed and mitigated.

> While the Board's oversight of risk primarily is performed by the Audit Committee, the Board has delegated to other committees the oversight of risks within their areas of responsibility and expertise.  For example, the Compensation Committee oversees risks associated with the Company's compensation practices, including by performing an annual review of the Company's risk assessment of its compensation policies and practices for its employees.  The Finance Committee oversees risks associated with the Company's capital structure, credit ratings and cost of capital, long-term benefit obligations, and use of or investment in financial products, such as derivatives to manage risk related to foreign currencies, commodities, and interest rates.   The Nominating and Governance Committee oversees risks associated with the Company's overall governance and its succession planning process to ensure that the Company has a slate of future, qualified candidates for key management positions.

> The Board believes that its oversight of risks, primarily through delegation to the Audit Committee, but also through delegation to other committees to oversee specific risks within their areas of responsibility and expertise, and the sharing of information with the full Board, is appropriate for a diversified technology and manufacturing company like 3M.  The chair of each committee that oversees risk provides a summary of the matters discussed with the committee to the full Board following each committee meeting.  The minutes of each committee meeting are also provided to all Board members.  The Board also believes its oversight of risk

is enhanced by its current leadership structure (further discussed below) because the CEO, who is ultimately responsible for the Company's management of risk, also chairs regular Board meetings.   Given his in-depth knowledge and understanding of the Company, the CEO is best able to bring key business issues and risks to the Board's attention.

159.    The 2017 Proxy Statement also contains a "Commitment to the Environment and

Sustainability" section, which states:

> At 3M, we are working hard to help create a better world for people everywhere. We apply our ingenuity, expertise, and our technology to solve problems innovatively, and with a focus on solutions for the longer term.  Sustainability is fundamental to our business philosophy – from product development and manufacturing to how customers use our products.
>
> For more than 40 years, 3M has been a leader among global corporations in sustainability actions and measures, beginning with the creation of its groundbreaking Pollution Prevention Pays (3P) Program in 1975 to a broad portfolio of sustainable products today.  As a global corporation, we believe that we have a significant responsibility to society in general, and especially to the communities in which we live and work.  Fulfilling our responsibility is important both from an environmental stewardship perspective and as a key competitive strategy.  Our corporate vision states: "3M technology advancing every company . . . 3M products enhancing every home . . . and 3M innovation improving every life."  It is that vision – that focuses on our customers' needs and well-being – that guides our sustainability strategies and goals, and the respect we demonstrate for our social and physical environments.
>
> We have created hundreds of sustainable solutions and product platforms to help our customers manage their environmental footprint – from paint systems that reduce the need for cleaning solvents and window films that ease energy consumption to a greener tape that is made with plant-based adhesive and film.
>
> In January 2013, our CEO formed the Sustainability Center of Excellence to focus on developing and commercializing products which help our customers solve their sustainability challenges and on ensuring sustainability within 3M operations and supply chain.   The Vice President of Environment, Health, Safety, and Sustainability reports to the Senior Vice President of 3M Supply Chain, who reports to the CEO.  The formation of the Sustainability Center of Excellence demonstrates the Company's commitment to integrate innovation and sustainability into our products and operations for the benefit of our customers and our communities.  The primary role of the Center is to develop strategy, set significant goals to track progress, and drive sustainable actions throughout 3M.  Sustainability will continue to be a vital focus as we work to truly advance every company, enhance every home, and improve every life.

As part of our sustainability efforts, we are a signatory to the United Nations Global Compact on Human Rights – a policy initiative for businesses to demonstrate their commitment to ten principles in the areas of human rights, labor, environment, and anti-corruption.  We will report annually on these corporate responsibility efforts in our Sustainability Report.  To learn more about our sustainability efforts, please view our Sustainability Report which is available on our Web site at www.3M.com under About 3M – Sustainability.

## B.    The 2018 Proxy Statement

160.    On March 21, 2018, the Company filed a proxy statement with the SEC on Form DEF 14A (the "2018 Proxy Statement").  The 2018 Proxy Statement identified the persons who were being nominated for director positions in connection with the Company's annual meeting of shareholders, which was held on May 8, 2018.

161.    The 2018 Proxy Statement references the Company's "Code of Business Conduct and Ethics for Directors," stating, in relevant part: "The Board also has adopted a Code of Business Conduct and Ethics for Directors of the Company.  This Code incorporates long-standing principles of conduct the Company and the Board follow to ensure the Company's business and the activities of the Board are conducted with integrity and adherence to the highest ethical standards, and in compliance with the law."

162.    The 2018 Proxy Statement also contains a section regarding the "Board's Role in Risk Oversight," which states:

The Board oversees the Company's risk profile and management's processes for assessing and managing risk, both as a whole Board and through its committees. At least annually, the Board reviews enterprise risks facing the Company and certain of its businesses.  Other important categories of risk are assigned to designated Board committees (which are comprised solely of independent directors) that report back to the full Board.  The Board has delegated to the Audit Committee through its charter the primary responsibility for the oversight of risks facing the Company including cybersecurity.  The Audit Committee's charter provides that the Audit Committee shall "discuss policies and procedures with respect to risk assessment and risk management, the Company's major risk exposures and the steps management has taken to monitor and mitigate such exposures."

The Vice President and General Auditor, Corporate Auditing (the "Auditor"), whose appointment and performance is reviewed and evaluated by the Audit Committee and who has direct reporting obligations to the Committee, is responsible for leading the formal risk assessment and management process within the Company. The Auditor, through consultation with the Company's senior management, periodically assesses the major risks facing the Company and works with those executives responsible for managing each specific risk. The Auditor periodically reviews with the Audit Committee the major risks facing the Company and the steps management has taken to monitor and mitigate those risks. The Auditor's risk management report, which is provided in advance of the meeting, is reviewed with the entire Board by either the chair of the Audit Committee or the Auditor. The executive responsible for managing a particular risk may also report to the full Board on how the risk is being managed and mitigated.

The Board has delegated to other committees the oversight of risks within their areas of responsibility and expertise. For example, the Compensation Committee oversees risks associated with the Company's compensation practices, including by performing an annual review of the Company's risk assessment of its compensation policies and practices for its employees. The Finance Committee oversees risks associated with the Company's capital structure, credit ratings and cost of capital, long-term benefit obligations, and use of or investment in financial products, such as derivatives to manage risk related to foreign currencies, commodities, and interest rates. The Nominating and Governance Committee oversees risks associated with the Company's overall governance and its succession planning process to ensure that the Company has a slate of future, qualified candidates for key management positions.

The Board believes that its oversight of risks, primarily through delegation to the Audit Committee, but also through delegation to other committees to oversee specific risks within their areas of responsibility and expertise, and the sharing of information with the full Board, is appropriate for a diversified technology and manufacturing company like 3M. The chair of each committee that oversees risk provides a summary of the matters discussed with the committee to the full Board following each committee meeting. The minutes of each committee meeting are also provided to all Board members. The Board also believes its oversight of risk is enhanced by its current leadership structure . . . because the CEO, who is ultimately responsible for the Company's management of risk, also chairs regular Board meetings. Given his in-depth knowledge and understanding of the Company, the CEO is best able to bring key business issues and risks to the Board's attention.

163. The 2018 Proxy Statement also contains a "Commitment to the Environment and

Sustainability" section, which states:

At 3M, we are working hard to advance every company, enhance every home, and improve every life. We apply our expertise, and technology to solve problems

collaboratively, and with a focus on long term, sustainable solutions that demonstrate our commitment and societal purpose. Sustainability is fundamental to our business – from sustainability-inspired innovation to product stewardship to sustainability in our operations. As we seek to improve every life, we see partnerships to help our customers and communities achieve their sustainability goals as key to that ambition.

For more than 40 years, 3M has been a leader among global corporations in sustainability actions and measures, beginning with the creation of its groundbreaking Pollution Prevention Pays (3P) Program in 1975. As a global corporation, we believe that we have a significant responsibility to society globally, and responsibility to the local communities in which we live and work. Our corporate vision states: "3M technology advancing every company . . . 3M products enhancing every home . . . and 3M innovation improving every life." It is that vision – carried out in collaboration with our customers, communities, and partners – that guides our sustainability strategies and goals and aspirations. Our sustainability efforts improve 3M operations and the operations of our customers. Our product solutions help customers manage their environmental footprint – from paint systems that reduce the need for cleaning solvents to window films that ease energy consumption. Our life cycle management process enables teams to select more sustainable components and encourage more sustainable processes. In addition, our philanthropic and social sustainability programs support the workforce of the future – both in Science, Technology, Education and Math (STEM), as well as the skilled trades. For example, our skills-based volunteering programs for employees encourage sustainability thinking inside the company while supporting the environmental and social needs in our local communities. Our 2025 sustainability goals provide us with a holistic approach to driving sustainability in our own operations, in our communities, and for the needs of our customers.

In January 2013, our CEO elevated the company's focus on sustainability, with emphasis in two areas: (1) developing and commercializing products which help our customers solve their sustainability challenges; and, (2) driving sustainability within 3M operations and supply chain. Sustainability is now embedded across the company with dedicated teams in R&D, Supply Chain, business groups, and regions across the globe. Recently, the establishment of an executive committee, the Science, Technology, and Sustainability Committee, provides leadership, oversight, and strategy to encourage and ensure sustainability opportunities are recognized and strong policies and procedures are in place. In addition, our Corporate EHS and Business Conduct Committee ensures our sustainability principles are embedded throughout the company.

As part of our sustainability efforts, we are a signatory to the United Nations Global Compact on Human Rights – a policy initiative for businesses to demonstrate their commitment to ten principles in the areas of human rights, labor, environment, and anti-corruption. We also align our goals and programs to the United Nations

Sustainable Development Goals.  We report annually on these efforts in our Sustainability Report.  To learn more, please visit www.3M.com/Sustainability.

## C.    The 2019 Proxy Statement

164.    On March 27, 2019, the Company filed a proxy statement with the SEC on Form DEF 14A (the "2019 Proxy Statement").  The 2019 Proxy Statement identified the persons who were being nominated for director positions in connection with the Company's annual meeting of shareholders, which was held on May 14, 2019.

165.    The 2019 Proxy Statement references the Company's "Code of Business Conduct and Ethics for Directors," stating, in relevant part: "The Board also has adopted a Code of Business Conduct and Ethics for Directors of the Company.  This Code incorporates long-standing principles of conduct the Company and the Board follow to ensure the Company's business and the activities of the Board are conducted with integrity and adherence to the highest ethical standards, and in compliance with the law."

166.    The 2019 Proxy Statement also contains a section regarding the "Board's Role in Risk Oversight," which states:

The Board oversees the Company's risk profile and management's processes for assessing and managing risk, both as a whole Board and through its committees. At least annually, the Board reviews enterprise risks facing the Company and certain of its businesses.  Other important categories of risk are assigned to designated Board committees (which are comprised solely of independent directors) that report back to the full Board.  The Board has delegated to the Audit Committee through its charter the primary responsibility for the oversight of risks facing the Company including cybersecurity.  The Audit Committee's charter provides that the Audit Committee shall "discuss policies and procedures with respect to risk assessment and risk management, the Company's major risk exposures and the steps management has taken to monitor and mitigate such exposures."

The Vice President and General Auditor, Corporate Auditing (the "Auditor"), whose appointment and performance is reviewed and evaluated by the Audit Committee and who has direct reporting obligations to the Committee, is responsible for leading the formal risk assessment and management process within the Company.  The Auditor, through consultation with the Company's senior

management, periodically assesses the major risks facing the Company and works with those executives responsible for managing each specific risk. The Auditor periodically reviews with the Audit Committee the major risks facing the Company and the steps management has taken to monitor and mitigate those risks. The Auditor's risk management report, which is provided in advance of the meeting, is reviewed with the entire Board by either the chair of the Audit Committee or the Auditor. The executive responsible for managing a particular risk may also report to the full Board on how the risk is being managed and mitigated.

The Board has delegated to other committees the oversight of risks within their areas of responsibility and expertise. For example, the Compensation Committee oversees risks associated with the Company's compensation practices, including by performing an annual review of the Company's risk assessment of its compensation policies and practices for its employees. The Finance Committee oversees risks associated with the Company's capital structure, credit ratings and cost of capital, long-term benefit obligations, and use of or investment in financial products, such as derivatives to manage risk related to foreign currencies, commodities, and interest rates. The Nominating and Governance Committee oversees risks associated with the Company's overall governance and its succession planning process to ensure that the Company has a slate of future, qualified candidates for key management positions.

The Board believes that its oversight of risks, primarily through delegation to the Audit Committee, but also through delegation to other committees to oversee specific risks within their areas of responsibility and expertise, and the sharing of information with the full Board, is appropriate for a diversified technology and manufacturing company like 3M. The chair of each committee that oversees risk provides a summary of the matters discussed with the committee to the full Board following each committee meeting. The minutes of each committee meeting are also provided to all Board members. The Board also believes its oversight of risk is enhanced by its current leadership structure . . . because the Executive Chairman, who served as our CEO and was ultimately responsible for the Company's management of risk, also chairs regular Board meetings. Given his in-depth knowledge and understanding of the Company, the Executive Chairman is best able to bring key business issues and risks to the Board's attention.

167.    The 2019 Proxy Statement also contains a "Commitment to the Environment and

Sustainability" section, which states:

At 3M, we are working hard to advance every company, enhance every home, and improve every life. We apply our expertise, and technology to solve problems collaboratively, and with a focus on long term, sustainable solutions that demonstrate our commitment and societal purpose. Sustainability is fundamental to our business – from sustainability-inspired innovation to product stewardship to sustainability in our operations. As we seek to improve every life, we see

partnerships to help our customers and communities achieve their sustainability goals as key to that ambition.

For more than 40 years, 3M has been a leader among global corporations in sustainability actions and measures, beginning with the creation of its groundbreaking Pollution Prevention Pays (3P) Program in 1975. As a global corporation, we believe that we have a significant responsibility to society globally, and responsibility to the local communities in which we live and work. Our corporate vision states: "3M technology advancing every company . . . 3M products enhancing every home . . . and 3M innovation improving every life." It is that vision – carried out in collaboration with our customers, communities, and partners – that guides our sustainability strategies and goals and aspirations. Our sustainability efforts improve 3M operations and the operations of our customers. Our product solutions help customers manage their environmental footprint – from paint systems that reduce the need for cleaning solvents to window films that ease energy consumption. Our life cycle management process enables teams to select more sustainable components and encourage more sustainable processes. In addition, our philanthropic and social sustainability programs support the workforce of the future – both in Science, Technology, Engineering and Math (STEM), as well as the skilled trades. For example, our skills-based volunteering programs for employees encourage sustainability thinking inside the company while supporting the environmental and social needs in our local communities. Our 2025 sustainability goals provide us with a holistic approach to driving sustainability in our own operations, in our communities, and for the needs of our customers.

In January 2013, our CEO elevated the company's focus on sustainability, with emphasis in two areas: (1) developing and commercializing products which help our customers solve their sustainability challenges; and, (2) driving sustainability within 3M operations and supply chain. Sustainability is now embedded across the company with dedicated teams in R&D, Supply Chain, business groups, and regions across the globe. Our Science, Technology, and Sustainability Executive Committee provides leadership, oversight, and strategy to encourage and ensure sustainability opportunities are recognized and strong policies and procedures are in place. Our Chief Technology Officer and our Chief Sustainability Officer report annually to the Board's Nominating and Governance Committee on our sustainability efforts. In addition, our Corporate EHS and Business Conduct Committee ensures our sustainability principles are embedded throughout the company. In December 2018, 3M announced that starting in 2019 every new product will be required to have a Sustainability Value Commitment that builds on 3M's history of creating products that emphasize reuse, recycling, and reduced resource use for 3M's operations and for our customers. As of March 1, 2019, 3M's global headquarters in St. Paul – which is home to our largest employee base – will be powered by 100% renewable energy. We are also committing to move our entire global operations to 100% renewable energy, with an interim target of 50% by 2025. As part of this initiative 3M will be joining RE100, an influential group of companies committed to 100% renewable energy.

As part of our sustainability efforts, we are a signatory to the United Nations Global Compact on Human Rights – a policy initiative for businesses to demonstrate their commitment to ten principles in the areas of human rights, labor, environment, and anti-corruption. We also align our goals and programs to the United Nations Sustainable Development Goals. We report annually on these efforts in our Sustainability Report. To learn more, please visit www.3M.com/Sustainability.

**D.    Proxy Statement Are False and Misleading**

168.    The foregoing statements were false and misleading in that they failed to disclose that the Board had violated its fiduciary duties to the Company through its culpable knowledge and/or reckless disregard of the fact that the Company faced significant legal liability related to its decades-long manufacture of harmful PFAS substances known to be environmentally unsound and biotically harmful and otherwise toxic. █████████████████████████

**VI.    CULPABLE BOARD KNOWLEDGE OF WRONGDOING**

169.    ████████████████████████████████





170. 

171.

172.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████

173.   ██████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████

██   ████████████████████

██   ██████████████████████████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████████████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████



















174.

175. ████████████████, Director Defendants ████████████████
████████████████ conducted a regular meeting of the Board. ████████

176.    The members of the Company's Audit Committee, ███████████████

████████████████████████ met ██████████████, with 3M executives, ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

177.    ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████



178. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████

179. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

████████████████

180.    The members of the Company's Audit Committee, █████████████████████

████████████████████ met ███████ ██████████████ with 3M executives, ██████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████

181.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

182.    The members of the Company's Audit Committee, ███████████

███████████ met ███ ███████ with 3M executives, ███████

███████████

███████████

███████████

███████████

███████████

███████████

███████

183.    ███████████

███████████

███████████

███████████

███████████

███████████

███████████

███████████

███████████

███████████

███████████

███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

184.   ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

185.   ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

186.   The members of the Company's Audit Committee, █████████
██████████████████████ met █████ █████████████, with 3M executives, █████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

187.

188.   The Board met ███████████████████████████████████



189.

190.

191. ██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

192. ██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████

193. ██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

194. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

195. ████████████████ the Audit Committee again convened for a meeting ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

196. █████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
████████████████████

197. █████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████

198. █████████████████████████████████████████
█████████████████████████████████████

199. █████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████

200.   The Board again met ████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████

201.   Director Defendants ████████████████████████████ met at an Audit

Committee meeting █████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████



202.



203. ███████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

204.   The Audit Committee met ████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████

205.    ████████████████████████████████████████████

███████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████

██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
███████

███████████████

206.    The Board of Directors met ████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████

207.    The Audit Committee again met ████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████

208. ███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

209. ███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

210. ███████████████████████████████

████████████████████████████████

███████████████████████████████████
███████████████████████████████████
████████████████████████████████

███████████████████████████████████
███████████████████████████████████
█████

██████████████████████

211. ███████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

█████████████

212. ████████████████████████████████

████████████████████████████████████

███████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

███████████

213. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████

    ████████████████████████████
    ████████████████████████████
    ████████████████████████████
    ████████████████████████████
    ████████████████████████████
    ████████████████████████████
    ███████████

███████████

214. ███████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████

215. ███████████████ the Board held a meeting, ████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████

216. ██ an Audit Committee meeting ██████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

217.   The Audit Committee met



218.

219.

220.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

221.   ████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

222.   ████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

223.   The Audit Committee again convened ██████████████████████████

224.   ████████████████████████████████████████████████████████████

225. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

226. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

227. ▮▮▮▮▮▮ the Audit Committee again met, ▮▮▮▮▮▮

228. ▮▮▮▮▮▮ the Board met, ▮▮▮▮▮▮

229. ▮▮▮▮▮▮ the Audit Committee again convened, ▮▮▮▮▮▮



230.

231.

232.

233.

234.

235.

236. ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████████████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
█████████████████████████████████

████████████████

237.    The Audit Committee again convened ██████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████

238. ██████████████████ the Board, █████████████████████

███████████████████████████████████████████

█████████████████████████ met ██████████████████████

███████████████████████████████████████████

239.

240.    The Audit Committee met █████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████

241.    ████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

          █████████████████████████████████████████████████████
          █████████████████████████████████████████████████████
          █████████████████████████████████████████████████████
          ██████████████████████████████

          █████████████████████████████████████████████████████
          ████████████████

          █████████████████████████████████████████████████████
          █████████████████████████████████████████████████████
          ████████████████████████

          █████████████████████████████████████████████████████
          █████████████████████████████████████████████████

          █████████████████████████████████████████████████████
          █████████████████████████████████████████████████████
          █████████████████████████████████████████████████████
          █████████████████████████

██████████████████

242.    ████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████

243.

244.

245. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

246. ████████████████████████████████████████

████████████████████████████████████████

247. ████████████████████ the Board, ████████████████████ met,

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

248. ██████████████████████████████████████

249. ██████████████████████████████████████

## VII.   DUTIES AND OBLIGATIONS OF THE INDIVIDUAL DEFENDANTS

### A.   Duties of All Director Defendants

250.   By reason of their positions as officers, directors, and/or fiduciaries of 3M, and due to their ability to control the business and corporate affairs of 3M and its subsidiaries, the Defendants owed 3M and its stockholders the fiduciary obligations of good faith, loyalty, and candor.  The Defendants were obligated to use their utmost abilities to control and manage 3M and its subsidiaries in a fair, just, honest, and lawful manner, and to promptly disseminate accurate and truthful information with respect to the Company's business operations, earnings, liabilities, and risks, including litigation risks and reserves.  The Defendants were, and are, required to act in furtherance of the best interests of 3M and its stockholders so as to benefit all stockholders equally, and not in their own personal interest or benefit.  This fiduciary obligation includes the obligation to accurately disseminate financial information in connection with any stockholder proxy statement disseminated to 3M stockholders, as well as the timely filing of accurate Company financial information.

251.   The Defendants, because of their positions of control and authority as directors and/or officers of 3M, and their attendance and votes at meetings of the Board and its subcommittees, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisor, executive, managerial, and directorial positions within 3M, and their attendance at meetings of the Board and its subcommittees, ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

each of the Defendants had access to material non-public information regarding the Company's exposure to PFAS litigation risks and knowing release of PFAS into the environment, including in ground, surface, and drinking water and into humans.  As to the Director Defendants, these acts include: soliciting stockholder votes based on an incomplete and materially misleading proxy

statement, disseminating false and misleading information in the Company's financial statements, and failing to act to correct such misstatements and omissions in the Company's SEC filings.

252.    The Defendants' conduct complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of 3M, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders, which the Defendants were, or should have been, aware of, posed a risk of serious harm to the Company.

253.    To discharge their duties, the officers and directors of 3M were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company and its subsidiaries.  By virtue of such duties, the officers and directors of 3M were required to, among other things:

- Exercise good faith to ensure that the affairs of the Company and its subsidiaries were conducted in an efficient, business-like manner to make it possible to provide the highest quality performance of their business;

- Exercise good faith to ensure that the Company and its subsidiaries were operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

- When put on notice of problems with the Company's and/or its subsidiaries' business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

254.    3M has established a Code of Business Conduct and Ethics for Members of the Board of Directors (the "Code of Conduct") that states, "[t]his Code incorporates long-standing principles of conduct the Company and the Board follow to ensure the Company's business and the activities of the Board are conducted with integrity, adherence to the highest ethical standards, and in compliance with the law.  Each director must comply with the letter and spirit of this Code." With regard to illegal or unethical behavior, the Code of Conduct provides:

Directors shall continue to promote ethical behavior through adherence to the highest ethical standards and the Board shall oversee steps taken by management to ensure the Company continues to: (a) encourage employees to talk to supervisors, managers and other appropriate personnel when in doubt about the best course of action in a particular situation; (b) encourage employees to report violations of laws, rules, regulations or the Company's Business Conduct Manual to appropriate personnel; and (c) inform employees that the Company will not allow retaliation for reports made in good faith.

255.     3M has also established a set of Corporate Governance Guidelines (the "Guidelines"), which are published on its website.  The Guidelines enumerate the following relevant responsibilities for 3M's directors:

> The Board of Directors – The business of the Company is conducted under the oversight of the Board of Directors.  The Board selects the Chairman and Chief Executive Officer and delegates to the CEO the authority and responsibility to manage the Company's operations.  The Board of Directors serves as elected representatives of the shareholders, acts as an advisor and counselor to the CEO and senior management, and oversees management performance on behalf of shareholders.  The Board reviews and approves significant corporate actions and major transactions, including, among other things, dividends, share repurchase, borrowing authorization, annual capital expenditure budget, and major capital expenditures, acquisitions, and divestitures.  The Board also oversees the Company's strategic and business planning and process and reviews and assesses management's approach to addressing significant risks facing the Company.

> * * *

> Director Responsibilities – Directors must exercise their business judgment to act in the best interests of the shareholders of the Company.  In discharging this obligation, directors reasonably may rely on the Company's senior executives and its advisors and auditors.  Directors are expected to attend the Annual Meeting of Stockholders and attend and participate in all meetings of the Board and of committees on which they serve and to spend the time needed to prepare for and meet as frequently as necessary to discharge their responsibilities.

*See* 3M Co., *3M Corporate Governance Guidelines* (as amended Nov. 12, 2019), https://s24.q4cdn.com/834031268/files/doc_downloads/governance/Corporate-Governance-Guidelines-Nov-12-2019-Final.pdf.

## B.     Duties of Director Defendants on the Audit Committee

256.    3M's Board has delegated additional responsibilities to its Audit Committee (made

up of Director Defendants Dillon, Brown, Craig, Moyo, and Page) through the Company's Audit

Committee Charter.

257.    The Audit Committee Charter makes clear that the Audit Committee is responsible

for assisting the Board in overseeing: (i) the integrity of the Company's financial statements and

internal controls over financial reporting; (ii) the Company's compliance with legal and regulatory

requirements; (iii) the qualifications and independence of the Company's independent registered

public accounting firm; (iv) performance of the Company's internal auditing department and the

Company's independent registered public accounting firm; and (v) the Company's capital structure

and financial risk assessment and management.

258.    The Audit Committee Charter further promulgates the following relevant

responsibilities for the Audit Committee:

> Roles and Responsibilities: The Committee's responsibility is one of oversight.
> The management of the Company is responsible for the preparation of complete
> and accurate annual and quarterly consolidated financial statements ("financial
> statements") in accordance with generally accepted accounting principles in the
> United States and for maintaining appropriate accounting and financial reporting
> principles and polices and internal controls over financial reporting designed to
> assure compliance with accounting standards and laws and regulations.   The
> Independent Accounting Firm is responsible for planning and conducting in
> accordance with the standards of the Public Company Accounting Oversight Board
> (PCAOB) an audit of the Company's annual consolidated financial statements and
> internal controls over financial reporting and a review of the Company's quarterly
> financial statements.  The Committee shall have the authority to take any and all
> acts that it deems necessary to carry out its oversight function, including but not
> limited to:
>
> Financial Reporting and Disclosure
>
> a.      Review and discuss the annual audited financial statements and quarterly
> financial statements with management and the Independent Accounting Firm,
> including the disclosures under the caption "Management Discussion and Analysis
> of Financial Condition and Results of Operations."  The Committee shall make a

recommendation to the Board as to whether the audited financial statements should be included in the Company's Annual Report on Form 10-K.

b.      Review the Company's financial reporting processes, including internal controls over financial reporting, and the process for the CEO and CFO quarterly certifications required by the SEC with respect to the Company's financial statements and internal controls over financial reporting.  Such review shall include a consideration of major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and any reports by the CEO and CFO regarding major issues as to the adequacy of the Company's internal controls over financial reporting, and any special audit steps performed in response to identified deficiencies.

c.      Review and discuss with management (including the senior internal audit executive) and the Independent Accounting Firm the Company's report on internal controls over financial reporting and the Independent Accounting Firm's audit of internal controls over financial reporting prior to filing of the Company's Form 10-K.

d.      Obtain and periodically review a report from the Independent Accounting Firm, describing (i) all critical accounting policies and practices to be used in the financial statements; (ii) all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the Independent Accounting Firm; (iii) any significant change in the selection or application of accounting principles; and (iv) other material written communications between the Independent Accounting Firm and management, such as any management representation letter, letters from the Company's General Counsel (or his designee), and/or schedule of uncorrected and corrected misstatements.  Review any reports on such topics or similar topics prepared by management, including any significant financial reporting issues and judgments made in connection with the preparation of the financial statements. Discuss with the Independent Accounting Firm any material issues raised in such reports.

e.      Participate in a telephonic meeting among management and the Independent Accounting Firm before each earnings release to review the earnings release, financial information, use of any non-GAAP information, and earnings guidance.

f.      Discuss with management and the Independent Accounting Firm (i) the effect of regulatory and accounting pronouncements, as well as off-balance sheet structures, if any, on the Company's financial statements, (ii) significant, unusual, or complex transactions, and (iii) the risk of fraud and the implementation of fraud controls.

Risk Management and Compliance

a.     Discuss policies and procedures with respect to risk assessment and risk management, the Company's major risk exposures and the steps management has taken to monitor and mitigate such exposures.

b.     With respect to the Company's capital structure, review and recommend for approval by the Board:

    1.     Dividends or other forms of distributions on the Company's stock, such as stock splits in the form of a stock dividend;

    2.     Authorization for repurchase of the Company's stock and periodically review repurchase activities;

    3.     Authorization for a global limit of external borrowings; and

    4.     Registration and issuance of the Company's debt or equity securities.

c.     With respect to the Company's financial risk assessment and management:

    1.     Periodically review the Company's capital allocation and capital structure strategies, insurance coverage, funding for pension and other post-retirement benefit plans, and global tax planning;

    2.     Periodically review the Company's global Treasury activities, including risks associated with cash investments, counterparties, and use of derivatives and other financial instruments for risk management purposes; and

    3.     Periodically review and approve the Company's use of swaps exemption pursuant to Dodd-Frank derivatives clearing policy.

d.     Periodically obtain reports from senior management, including the Chief Information Officer, regarding information technology networks and systems and the adequacy and effectiveness of the Company's information security policies and internal controls regarding information security.

e.     Review the effectiveness of the system for monitoring compliance with laws, regulations and the Company's business conduct policies and the results of management's investigation and follow-up on any fraudulent acts or accounting irregularities.  Providing oversight of the Company's environmental stewardship, including environmental, health and safety (EHS) legal and regulatory compliance, is the responsibility of the Science, Technology & Sustainability Committee.

f.      Review the appointment, replacement, and reassignment and periodically evaluate the performance of the Company's Chief Compliance Officer, who shall have direct reporting obligations to the Committee.

g.      Periodically obtain reports from the Chief Compliance Officer on compliance, and at least annually, on the implementation and effectiveness of the Company's compliance and ethics program.

h.      Review with the Company's General Counsel legal matters that may have a material impact on the consolidated financial statements and any material reports or inquiries received from regulators or governmental agencies regarding compliance.

i.      Establish procedures for (i) the receipt, retention, and treatment of complaints received by the company regarding accounting, internal accounting controls, or auditing matters, and (ii) the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters. Review periodically with the Chief Compliance Officer and Internal Audit these procedures and any significant complaints received.

Meetings, Reports, Charter Review, Performance Evaluation and Outside Advisors

a.      The Committee shall meet with such frequency and at such intervals as it shall determine is necessary to carry out its duties and responsibilities, but in any case, not less than four times a year. The Committee shall meet separately, periodically, with management, with internal auditors, the Chief Compliance Officer, and with the Independent Accounting Firm. A majority of the members shall constitute a quorum. A majority of the members present shall decide any matter brought before the Committee.

b.      Report regularly to the Board.

c.      Prepare the report of the Committee required to be included in the Company's annual proxy statement.

d.      Review the adequacy of this Charter at least annually and recommend any proposed change to the Board for approval.

e.      Conduct an annual performance evaluation of the Committee.

f.      The Committee shall have the authority to retain such outside legal, accounting or other advisors, as the Committee may deem appropriate in its sole discretion. The Committee shall have sole authority to approve related fees and retention terms.

*See* 3M Co., *3M Company Board of Directors Audit Committee Charter* (as amended Nov. 12, 2019), https://s24.q4cdn.com/834031268/files/doc_downloads/charters/Audit-Committee-Charter-Nov-12-2019-Final.pdf.

## VIII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

259.   The Director Defendants face a substantial likelihood of liability for their individual misconduct.   The Director Defendants were directors throughout the time of the misconduct referenced above, and, as such, had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, risk disclosures, and financial statements were accurate.

260.   Moreover, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively and in good faith), and to ensure the Board's duties were being discharged in good faith and with the required diligence and due care.   Instead, the Director Defendants knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of 3M.

261.   The Director Defendants' making, or authorization, of these false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of fiduciary duties that have resulted in the Director Defendants facing a substantial likelihood of liability.   If the Director Defendants were to bring a suit on behalf of 3M to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.   This renders each of them interested and, for this reason also, demand is futile.

262.   The Director Defendants have demonstrated a longstanding unwillingness or inability to act to uphold their fiduciary obligations to the detriment of the Company, and will not sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein, of which there is a substantial likelihood of liability.  The Director Defendants have longstanding relationships with each other, and therefore are not able to, and will not, vigorously prosecute any such action.

263.   The Director Defendants participated in and approved the wrongdoing described herein and participated in efforts to conceal or disguise those wrongs from 3M's stockholders and are, therefore, not disinterested parties.

Pursuant to their specific duties as Board members, the Director Defendants are charged with oversight of the Company and its compliance with the law.  The Director Defendants breached their fiduciary duties of loyalty they owed to 3M and its stockholders in that they failed to prevent and correct known securities fraud violations and false financial reporting, and acquiesced to management in failing to disclose the Company's true financial condition and refused to set any reserve for significant outstanding legal liabilities facing the Company as a result of its manufacture and disposal of PFAS and its byproducts.  Thus, each Director Defendant is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action.

264.   The Director Defendants have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their longstanding positions of control and the perquisites derived therefrom, and have failed to timely institute

reforms that would allow accurate financial reporting.  The Director Defendants are thus incapable of exercising independent judgment in deciding whether to commence and vigorously prosecute this action.

265.    3M has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the current Board has not filed any lawsuits against itself or others who were responsible for that wrongful conduct to attempt to recover for 3M any part of the damages 3M suffered, and will suffer, thereby.

266.    Defendants Thulin, Roman, and Gangestad are defendants in the Securities Action.



The participation of Defendants Thulin, Roman, and Gangestad in the alleged securities fraud disqualifies them and the Director Defendants from independently considering demand.

267.    In order to bring this action for breaching their fiduciary duties, the Director Defendants would have been required to sue themselves and/or their fellow directors and executives in the top ranks of the Company, who are their personal friends and with whom they have entangling financial alliances, personal and business interests, and other dependencies, which they would not do.

## IX.    DAMAGES TO THE COMPANY

268.    As a result of the Individual Defendants' breaches of their fiduciary duties of loyalty and good faith, 3M has been injured and incurred significant damages and expenses, and will continue to expend significant sums, including:

(a)     $897 million in payments to the State of Minnesota as a result of settlement of the Minnesota AG Action; $35 million in payments to WMELA as a result of the settlement of the WMELA's litigation against 3M related to PFAS at its Decatur, Alabama facilities; and $251 million in already-reserved litigation liabilities;

(b)     an untold amount of additional and as-yet unreserved liability as a result of the myriad additional litigation facing the Company related to the manufacture, sale, and disposal of PFAS;

(c)     costs incurred to carry out internal investigations, including the costs of legal and other fees paid to outside counsel, auditors, and other experts, to evaluate the legal claims facing the Company and investigate the Company's accounting practices relating to legal liability and the setting of reserves;

(d)     resultant loss of business and business opportunities for the Company's failure to candidly discuss the injuries to the environment and humanity incurred as a result of PFAS exposure;

(e)     loss of market value and stockholder equity;

(f)     legal fees, costs, and amounts payable in settlement or satisfaction of the Securities Action brought against the Company related to the foregoing wrongdoing;

(g)     the increased capital costs the Company will incur as a result of loss of market capitalization and the Company's damaged reputation in the investing community as a result of the foregoing; and

(h)     costs related to the Company's continued failure to comply with regulations regarding the discharge of PFAS materials from its facilities and in products manufactured by 3M and/or using PFAS manufactured and sold by 3M to other business customers.

269.    3M has been directly and substantially injured by reason of the Defendants' intentional breach and/or reckless disregard of their fiduciary duties of loyalty to the Company. Plaintiff, as a stockholder and representative of 3M, seeks damages and other relief for the Company, in an amount to be proven at trial.

## X.     CLAIMS FOR RELIEF

### CLAIM I:
### Violation of Section 14(a) of the Exchange Act

270.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

271.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by, or on behalf of, the Defendants.  The Section 14(a) Exchange Act claims alleged herein do not allege, and do not sound in, fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the non-fraud Section 14(a) claim.

272.    Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. §78l]."

273.    Rule 14a-9, promulgated pursuant to §15(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14a-9.

274.    Under the direction of the Defendants, the 2017, 2018, and 2019 Proxy Statements were prepared and filed with the SEC and failed to disclose that:

125

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

275.     In the exercise of reasonable care, the Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017, 2018, and 2019 Proxy Statements were materially false and misleading or omitted to disclose material information necessary to make the statements contained therein not materially misleading.

276.     The misrepresentations and omissions were material to shareholders in deciding how to vote on the matters set forth for shareholder determination in the 2017, 2018, and 2019 Proxy Statements, including election of directors and ratification of the appointment of an independent registered public accounting firm.

277.     The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the 2017, 2018, and 2019 Proxy Statements.

## CLAIM II:
## Breach of Fiduciary Duties of Loyalty and Good Faith

278.     Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

279.     The Defendants had, and have, a fiduciary duty to 3M.  By reason of their fiduciary relationships, the Defendants owed, and owe, 3M the highest obligations of good faith, fair dealing, loyalty, and due care.

280.    The Defendants, and each of them, violated and breached their fiduciary duties by allowing 3M to misstate and fail to reserve its significant litigation liability risks, permitting 3M to file false and misleading financial statements and disseminate materially false and misleading proxy statements.

281.    As a direct and proximate cause of the Defendants' breaches of their fiduciary obligations, 3M has suffered damages, as alleged herein.  As a result of the misconduct alleged herein, the Defendants are liable to the Company.

282.    Plaintiff, on behalf of 3M, has no adequate remedy at law.

## CLAIM III:
### Breach of Fiduciary Duty of Candor
### in Connection with Violation of the Federal Securities Laws

283.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

284.    The Defendants owed, and owe, the Company a duty to disclose material information in their possession concerning the Company's business and operations in all public filings and statements to stockholders and the public.

285.    The Defendants violated and breached their duties of loyalty, good faith, and candor by concealing the problems and risks concerning 3M's PFAS litigation liability and by issuing false and misleading financial statements in violation of GAAP and false and misleading SEC filings.

286.    As a direct and proximate result of Defendants' breaches of their duties of loyalty, good faith, and candor, 3M violated its disclosure obligations under the Securities Act of 1933 and the Securities Exchange Act of 1934 and has sustained significant damages.  As a result of the misconduct alleged herein, the Defendants are liable to the Company.

**CLAIM IV:**
**Unjust Enrichment**

287.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

288.    By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of, and to the detriment of, 3M.  The Defendants were unjustly enriched as a result of the compensation and remuneration they received while breaching fiduciary duties owed to 3M.

289.    Plaintiff, as a 3M stockholder and representative of 3M, seeks restitution from the Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

290.    Plaintiff, on behalf of 3M, has no adequate remedy at law.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of 3M and that Plaintiff is proper and adequate to represent the interests of the Company;

B.    Declaring that the Defendants have breached their fiduciary duties of good faith, loyalty, due care, and candor to 3M and 3M's stockholders;

C.    Determining that the Defendants have violated Section 14(a) of the Exchange Act by issuing materially false and misleading proxy statements;

D.    Determining and awarding to 3M the damages sustained by it, as a result of the dissemination of materially false and misleading filings on Forms 10-K, 10-Q, and DEF-14A with the SEC, as described herein, and the breaches of fiduciary duties and other claims set forth above from each of the Defendants, jointly and severally;

E.      Directing 3M to take all necessary actions to reform and improve its corporate governance and internal procedures, to enable the Company to comply with its existing governance obligations and all applicable laws, and to protect the Company and its stockholders from a recurrence of the damaging events described herein;

F.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

G.      Awarding pre- and post-judgment interest; and

H.      Granting such other and further relief as this Court deems just and equitable.

## XII.   JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  August 14, 2020                      Respectfully Submitted,

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ Scott R. Jacobsen
Scott R. Jacobsen
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 519-0521
Facsimile:  (212) 223-6334
sjacobsen@scott-scott.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Geoffrey M. Johnson
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone:  (216) 229-6088
Facsimile:  (860) 537-4432
gjohnson@scott-scott.com

*Attorneys for Plaintiff*

## VERIFICATION OF RICHARD TUNICK

I, Richard Tunick, shareholder of 3M Company, do hereby declare:

I have read the foregoing VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT and know the contents thereof. I certify that I have authorized its filing and that the foregoing is true to the best of my knowledge, information and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: August 4, 2020



_____

Richard Tunick